237 P.3d 1156

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Robert James BEHRENDT aka Running Bear, Petitioner/Defendant–Appellant.**

**No. 29191.**

Supreme Court of Hawai'i.

Aug. 19, 2010.

Ronette M. Kawakami, Deputy Public Defender, for petitioner/defendant-appellant.

Linda L. Walton, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee.

MOON, C.J., NAKAYAMA, DUFFY, and RECKTENWALD, JJ.; with ACOBA, J., dissenting.

Opinion of the court by
RECKTENWALD, J.

Defendant Robert Behrendt, also known as Running Bear, was convicted of sexual assault for conduct involving SI, a minor under the age of 16. We must decide whether evidence of sexual contacts between Behrendt and SI that occurred prior to the conduct charged in this case was admissible under Hawai'i Rules of Evidence (HRE) Rules 404(b) and 403, cited *infra*. For the reasons set forth below, we conclude that the Circuit Court of the Third Circuit[1] did not err in admitting that evidence.

1. The Honorable Elizabeth A. Strance presided.

SI grew up in Kona, Hawai'i, but moved to South Dakota when she was 11 to live with Behrendt and her sister, LI, who was married to Behrendt. The evidence presented by the State of Hawai'i at trial established that after SI arrived in South Dakota, Behrendt suggested that SI shower with him when they were alone. SI refused initially, but subsequently agreed. Behrendt had SI touch him sexually during these showers, and also touched SI. Eventually, they began to have intercourse, and Behrendt told SI not to tell anyone. SI, who was confused and frightened by what was happening, complied with that request.

When SI was 14, she returned to Kona with Behrendt and LI. Behrendt and SI continued to have sexual relations. SI eventually broke off her sexual relationship with Behrendt, but did not report it to police until more than a year later. Behrendt was subsequently indicted for three counts of sexual assault in the first degree in violation of Hawai'i Revised Statutes (HRS) § 707–730(1)(c) (Supp.2006) [2] for the conduct which occurred in Kona. The indictment grouped the three counts based on the time periods in which SI lived at three different houses in Kona: (1) Count 1: the Kamani Trees house, covering the period from September 2002 through February 2003, (2) Count 2: the Aloha Kona house, covering the period from February 2003 through May 2004; and (3) Count 3: the Pumehana house, covering the period from May 2004 through August 2004. Behrendt was also indicted for kidnapping in

violation of HRS § 707–720(1)(d) & (e) (1993) [3] (Count 4) with respect to an incident that occurred in January 2005.

Behrendt moved in limine to exclude testimony concerning the instances of sexual contact that occurred while SI was living in South Dakota.[4] The circuit court held that the evidence was probative of motive, opportunity and plan, and that its probative value was not outweighed by its prejudicial effect. A jury found Behrendt guilty of the lesser included offense of sexual assault in the third degree in violation of HRS § 707–732 (Supp. 2006) [5] on Counts 1–3, and the lesser included offense of unlawful imprisonment in the first degree in violation of HRS § 707–721 (1993) [6] on Count 4. In a summary disposition order (SDO), the Intermediate Court of Appeals (ICA) affirmed the convictions on Counts 1, 2, and 4, but vacated the conviction on Count 3 because the circuit court did not properly instruct the jury on the law applicable to Count 3 at the time of the offense.

In his application for a writ of certiorari (application), Behrendt argues that the circuit court erred in admitting the South Dakota evidence. However, we agree with the circuit court that the evidence was probative of Behrendt's opportunity to commit the offenses in Hawai'i without being detected. Moreover, the circuit court did not abuse its discretion in determining that the admission of the evidence would not unduly prejudice Behrendt.

---

**2.** HRS § 707–730(1)(c) (Supp.2006) provides that a person engages in first degree sexual assault when "[t]he person knowingly engages in sexual penetration with a person who is at least fourteen years old but less than sixteen years old; provided that: (i) The person is not less than five years older than the minor; and (ii) The person is not legally married to the minor; . . . ."

**3.** HRS § 707–720(1) (1993) provides, in relevant part, that "[a] person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to: . . . (d) Inflict bodily injury upon that person or subject that person to a sexual offense; (e) Terrorize that person or a third person; . . . ."

**4.** There was also some evidence of sexual contacts which occurred while SI was traveling with LI and Behrendt elsewhere on the mainland,

including Washington state. For ease of reference, we will refer to these events collectively as the South Dakota evidence.

**5.** HRS § 707–732(1)(c) (Supp.2006) provides that a person engages in third degree sexual assault when "[t]he person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old; provided that: (i) The person is not less than five years older than the minor; and (ii) The person is not legally married to the minor; . . . ."

**6.** HRS § 707–721 (1993) provides, in relevant part, that "[a] person commits the offense of unlawful imprisonment in the first degree if the person knowingly restrains another person: (a) Under circumstances which expose the person to the risk of serious bodily injury; or (b) In a condition of involuntary servitude."

Behrendt also argues that the circuit court erred in instructing the jury on the lesser included offense of sexual assault in the third degree, and that there was insufficient evidence to support the convictions on Counts 1–3 because the evidence referred only to sexual penetration, rather than sexual contact. However, for the reasons set forth below, we reject those arguments.

Accordingly, we affirm the ICA's November 24, 2009 judgment.

## I. BACKGROUND

### A. Pre-trial Proceedings Regarding Other Acts Evidence

The State filed a Notice of Intent to Use Specified Evidence, to "give[ ] notice that the State intends to present evidence relating to [Behrendt's] pattern of threats to [SI], and the grooming and ongoing nature/length of their relationship." The State attached police reports that contained allegations of sexual contacts in South Dakota. In response, Behrendt filed a motion in limine, arguing that the evidence was inadmissible under HRE Rules 401, 403 and 404. He also asserted that SI was fabricating the allegations because Behrendt and LI were in the middle of a divorce and custody dispute over their daughter.

The circuit court granted Behrendt's motion without prejudice, explaining that the State did not clearly identify all the prior bad act evidence it intended to offer in its case-in-chief or explain how it was relevant, and did not analyze the balancing of probative value versus prejudicial effect.

The State filed an amended notice and motion to reconsider. The State included detailed descriptions of the expected testimony of each proposed witness, and argued that the evidence of the prior acts was relevant "to show the defendant's motive, purpose and intent; to show opportunity; and to show why [SI] did not, for years, disclose the abuse." Additionally, the State explained why each witnesses' testimony was relevant, and analyzed its admissibility under HRE

Rule 403. Behrendt filed an opposition arguing, inter alia, that "there are 23 months of context in Hawaii, which is abundantly sufficient to establish context."

The circuit court granted in part and denied in part the State's motion for reconsideration. The circuit court rejected the State's argument that prior bad act evidence is always relevant to explain the context of the relationship between the defendant and complaining witness, and concluded that the expected testimony of two of the State's witnesses [7] was not admissible because the probative value did not outweigh the prejudicial effect and the State's offer of proof was vague and cumulative. The circuit court's order additionally provided, in relevant part:

> The court grants that portion of State's Motion to Reconsider admission of testimony concerning "other acts" that allegedly occurred outside of the State of Hawaii as follows. The Court concludes that the issue of "delayed reporting" is squarely before the jury, as well as possible issues of consent concerning the kidnapping charge. *The Court finds that the "other bad acts" allegedly committed outside of the State of Hawaii as described by [SI], [LI] and [LI's friend, Trista], are relevant to show motive, opportunity and plan.*
>
> The court having concluded that the testimony is relevant, next balances whether relevant evidence should be excluded because its probative value is substantially outweighed by other factors, including danger of unfair prejudice, confusion of issues or misleading the jury, pursuant to Rule 403, [HRE].
>
> Specific factors that the court has considered in the Rule 403 analysis in deciding whether to admit "other acts", include the strength of evidence of the prior act, the time elapsed between the prior and [sic] crimes charged, the need for the other acts, efficacy of alternative proof, and whether the other acts are likely to raise overmastering hostility. *The Court concludes that the prejudice of admitting the testimony of [SI], [LI] and [LI's friend,*

---

7. The witnesses, cousins of SI and LI, were expected to testify that Behrendt, SI, and LI "visited them in 2002 before their return to Hawaii, and [Behrendt] seemed unusually physical with [SI.]"

*Trista], does not outweigh the relevance, and that a cautionary instruction ameliorates any prejudice.*

. . . .

### III. *OTHER BAD ACTS OCCURRING IN HAWAII.*

The court finds that most of the witnesses who will testify to the relationship between the defendant and the complaining witness will present testimony that could be considered "other bad acts". Many are family and friends who may have been in close contact with the defendant and minor, several living in the same household. Some of the testimony describes acts, such as holding hands and kissing, that could be considered either innocent or a "bad act".

The court finds and concludes that the testimony of the following witnesses concerning "other acts" or "bad acts" that happened in Hawaii is relevant to motive, opportunity, intent and plan[.] The court further finds that the probative value is not "substantially outweighed" by other factors, including danger of unfair prejudice, confusion of issues or misleading the jury. The court finds that a cautionary instruction ameliorates any prejudice. . . .

(Emphases added).

### B. Trial

The relevant evidence at trial was, in summary, as follows.

#### 1. State's Case

##### a. SI's Testimony

###### (1) *South Dakota*

In November of 1999, when SI was eleven years old, she moved out of her parents' home in Kona and went to live with LI and Behrendt in South Dakota.[8] SI testified that in South Dakota, Behrendt would take her to school every day, pick her up in the afternoon and take her back to the apartment, and they would talk and play video games while LI was still at work. Behrendt would talk with SI about "other boys" and said, "[y]ou'll soon have a boyfriend." After living there for a few months, SI and Behrendt went to the pool one day, and when they got home "[Behrendt] asked [her] to take off [her] clothes, and [ ] take a shower together[,]" but SI refused. The next time they went to the pool, however, Behrendt told SI that "it was okay" for her to shower with him and that he had asked LI and that "she said it was okay." After that, SI "trusted him" and showered with Behrendt while both of them were naked, and "[Behrendt] would be erect sometimes, and he would tell me to grab onto him, grab onto his dick." SI testified that their showers eventually progressed to the point where Behrendt would touch SI's genitalia and insert his penis into her genitalia. She was afraid to tell him no "[b]ecause he was an adult" and had told her that "it was okay." SI testified that she and Behrendt also had "sexual contact" elsewhere in the apartment, and that Behrendt showed SI a videotape of pornography. SI testified that they had sex "[o]ften" in South Dakota, and that she remembered it being more frequent than when they later returned to Hawai'i.

During the first few months of these sexual encounters, SI "felt like [she] loved [Behrendt] as a brother. But then [she] just . . . knew that there was something wrong. But [she] was confused" and would "push[ ] him off a lot" and "be rude to him." SI also testified that after about the tenth time she and Behrendt had sex, he told her not to tell LI and that if she told "he would end up going to jail." SI testified "it seemed like [Behrendt] was changing it to be like a relationship" and "was thinking of [her] as a girlfriend" but that she was annoyed by it and "didn't want him."

SI also recalled a time when she attended a going-away party at the home of LI's friend Trista, and she and Behrendt were sitting outside when a boy walked by whom SI identified as her "boyfriend" and this made Behrendt "mad." Later on she and Behrendt went into the bathroom together, and he kissed her. He said, "[l]et's do it inside the bathroom," but SI told him no. Behrendt "got upset" and "ended up head-butting the wall[.]"

---

**8.** Behrendt is twelve years older than SI, and LI is eleven years older than SI.

SI testified that she did not confide in her sister when they lived in South Dakota because she "was scared" and "[LI] always seemed happy, so I also felt guilt that I would have ruined her life." SI recalled that LI had asked her if Behrendt was touching SI like their uncle had,[9] but SI just shook her head and said nothing.

## (2) *Return to Hawai'i*

Behrendt, LI and SI returned to Hawai'i in September 2002, when SI was fourteen years old. SI testified that around that time, she started "liking [Behrendt],· because he was there for [her]" and they had a "[f]riendship" where SI "told him everything[,]" he bought her things and would stick up for her. SI was home schooled in Hawai'i, and Behrendt was the only person SI got along with because her family "was broken apart" and "didn't get along."

### (a) *Kamani Trees (Count 1)*

SI, Behrendt and LI moved into the Kamani Trees house, along with SI's parents, her older brother (Brother) and Brother's children. During this time, SI slept in the same bed as LI and Behrendt. SI and Behrendt continued to have sexual intercourse approximately three to five times per month in both the bedroom and the bathroom. SI specifically recounted the first time they had intercourse at Kamani Trees, in which Behrendt "turned [her] around and [ ] had sexual intercourse with [her] in the back[,]" while LI slept next to them. SI also testified that they also had oral sex "[a]nytime [they] would have sexual intercourse[,]" where she "would just lick him or [ ] would suck on his dick."

### (b) *Aloha Kona house (Count 2)*

SI, Behrendt, and LI next lived at the Aloha Kona house from February 2003 until April or May 2004, with SI's parents, Brother and Brother's children. SI's bedroom consisted of a curtained-off area of the living room. Behrendt would come into her bedroom early in the morning, SI would braid his hair, she and Behrendt would talk and he would tell SI "[h]ow much he loved [her]." They continued to have sexual intercourse once or twice a week in SI's curtained-off room and sometimes in the bedroom Behrendt and LI shared. Behrendt would also drive SI to a nearby construction site and they had sex in the back of the car.

SI and LI hardly spoke because they "were fighting [for] attention from Bear" and "[LI] had a feeling of something that was going on between the two of us." Behrendt, who was of Native American ancestry, told SI to call him "[h]igna[,]" which was the Lakota name for husband. Behrendt told SI that in his Lakota culture, "they had two wives" who were sisters. SI felt "like that [Behrendt] could be my husband. That I loved him. And . . . I was confused."

After living in the Aloha Kona house, SI moved with her parents, LI and Behrendt to a house on Painted Church Road in Kona, and she and Behrendt had sexual intercourse in one of the rooms of the house.

### (c) *Pumehana House (Count 3)*

In May 2004, when SI was fifteen years old, LI, Behrendt, and SI moved into the Pumehana House, along with SI and LI's parents, Brother, and Brother's children, and lived there until November 2004. SI and Behrendt continued to have sexual intercourse about once a month. Again, a curtained-off area served as SI's bedroom, and SI continued to braid Behrendt's hair and then he would want to have "a quickie or something." They would also have sex in rental cars from Behrendt's workplace, SI's mother's car, and once at a storage place nearby where Behrendt had SI "bent over the back seat[.]" Also, about one month before SI's sixteenth birthday, Behrendt took her in a rental car to a construction site in Kaloko, they had sexual intercourse, and Behrendt asked her if she wanted to have anal intercourse and she "[s]hrugged." Behrendt then "attempt[ed] it" and "put his penis in [her] anal, [her] butt."

9. SI testified that when she was in 3rd or 4th grade, she told a teacher at school that her uncle had molested her when she was four or five. LI also testified that the same uncle molested LI when LI was six. After SI was molested, SI received counseling.

#### (d) *Gabby's House & Crazy Horse Apartments*

SI testified that four or five months after she turned sixteen, she moved out of the Pumehana house and in with a friend, Gabby, and Gabby's father for a few months until her "family drama" cooled down. At this time, LI moved to the mainland, and Behrendt moved out of the Pumehana house and into the Crazy Horse Apartments in Kona. SI moved in with Behrendt, and started dating a boy named Brandon. She and Behrendt had arguments about Brandon because "[Behrendt] didn't want [her] to be going out with [him]."

#### (e) *January 17, 2005 incident (Count 4)*

SI testified that she had a disagreement with Behrendt on January 17, 2005 in the Crazy Horse apartment after SI told him that she didn't want to have sex with him anymore because she was dating Brandon. SI tried to get out of the apartment but Behrendt "pulled [her] back and threw [her] to the ground" and "straddled [her] down." SI screamed and tried to break free, but Behrendt told her to "[b]e quiet[,]" slapped her on the face and arm, "unzipped himself and [ ] took out his penis[,]" and told SI he was going to get her pregnant. SI eventually ran out of the apartment, but Behrendt brought her back. They got into Behrendt's car and continued to struggle, and Behrendt slapped her. SI testified that she was scared that Behrendt may kill her. Finally, Behrendt dropped SI off at Gabby's house, SI called Brandon to pick her up, and Brandon's parents called the police.

SI testified that the police arrived a day and a half later in response to SI being reported a runaway, and took SI to the station. She told police Behrendt hit her and that she had bruises on her arm and her ribs hurt, but did not tell them about their sexual relationship because she "didn't want him to go to jail."

#### (f) *Alleged abuse reported*

On March 22, 2006, Behrendt came into Jamba Juice where SI worked, and when SI saw him, she became upset. SI's boss asked her what was wrong, and SI told her about her sexual history and relationship with Behrendt. SI next told LI, who went to the police.

### b. LI's Testimony[10]

#### (1) *South Dakota*

LI testified that Behrendt would spend time with SI at home until LI returned from work each day. Behrendt told LI that he took showers with SI at their apartment, and LI told him "it was inappropriate for him to be doing that with her." Behrendt responded that "it was okay." LI also observed SI and Behrendt "horse-playing around" one day at their apartment:

> [SI] ended up underneath him, and he was on top of her, with—you know, just the way how they were like looking at each other like made me kind of feel uncomfortable and that he was like—the way how he was stroking her hair back just made me very uncomfortable like, you know, why are they acting like that towards each other, you know.

LI did not confront Behrendt about this incident because she "was scared."

LI recounted a time when they went to a party at her friend Trista's house and Behrendt "all of a sudden [ ] just kind of got upset" and was acting "really jealous." Then he and SI went upstairs to the bathroom for about thirty minutes. After they came out, LI noticed that there was a hole in the wall in the bathroom, that SI had "a red mark" that "looked like a hickey" and was "very upset." LI confronted Behrendt about it and he told her that "he accidentally grabbed [SI] by the neck[.]"

**10.** Prior to LI's testimony, which preceded SI's testimony, the circuit court gave the following cautionary instruction:

> Ladies and gentlemen of the jury, you are about to hear evidence that the defendant may have engaged in other crimes, wrongs, or acts. You must not use this evidence to determine that the defendant is a person of bad character and, therefore, must have committed the offenses charged in this case. Such evidence may be considered by you only on the issues of defendant's motive, opportunity, and intent and for no other purpose.

LI also recalled an incident when they were on their way back to Hawai'i and staying at a cousin's house in Washington. LI testified that LI, Behrendt and SI were sleeping next to each other on the floor one night, and SI and Behrendt

> ... started acting kind of weird with each other. So I kind of stayed up so where to see how they would act towards each other. And during this night I heard—it was pitch black, and I heard him say get on top. And she's like, no. And I was just wondering like what are they talking about, you know.

> And then I saw her on top. And then I was like, what are they doing, you know. In my mind I was thinking like why are they—what are they doing, you know. And so—and then all I hear her say was ouch. And I'm like, What's going on? So I put my arm around him, and so—and all he could do was like just move my arm[.]

LI did not confront Behrendt because she "was scared of the fact of what was happening" and "didn't know what to do at that time[.]" LI confronted SI the next morning, but SI told her that nothing was going on.

LI further testified that SI would call Behrendt higna, which meant husband in Lakota. When LI talked to Behrendt about his interactions with SI, he would yell at her and tell her that she was "selfish" and "a bitch for interfering." LI testified that "[Behrendt] told me a long time ago that when he gets married to me or if I had a sister or someone younger than I am, he would take 'em as a wife."

### (2) Hawai'i

LI testified that when she and Behrendt lived at the Kamani Trees house, SI would sleep in bed with them. "[Behrendt] was starting to act very jealous" and he and SI were always together and "were still taking showers together." When LI talked to Behrendt about taking showers with SI, "he got upset with me and grabbed me by the arm and started shaking me and telling me I was selfish and I was ruining everything [that] he wanted to do. And I was interfering with both of them." LI also noticed that "[t]hey started kissing" and "[Behrendt] started

holding her hand, putting his arms around her and, you know, just like a boyfriend and girlfriend[.]" LI testified that when she asked him about it,

> He just told me that he—you know, it was his culture and that I was ruining his culture because he's Native American. And that in the mainland, they used to do that all the time, that they used to hold hands and nobody said anything. And now that we moved down here, that everybody's saying something and, you know, it was wrong for them to do it. . . .

When they moved to the Aloha Kona house, sometimes LI would wake up early in the morning and Behrendt would be in SI's curtained-off bedroom. Behrendt told her that SI was braiding his hair. Also, Behrendt would get upset when she or others in her family would "say something to him about how he was acting towards [SI]."

When they moved to the Pumehana house, Behrendt and SI "got closer" and "[h]e was always around her all the time . . . . you couldn't separate them." They also "started wearing rings together." LI and Behrendt had a daughter in June 2004, and Behrendt told LI that "he wanted SI to be called mom also." LI tried to get Behrendt to move to the mainland, but he did not want to move unless SI moved with them.

In November 2004, LI moved to Washington and lived with her cousin for a few months. LI returned to Hawai'i on January 11, 2005, and moved back in with Behrendt on the 23rd. Behrendt told LI that he and SI had gotten in a fight about something when they were in the car and that he hit her with the back of his hand. After LI moved in, she never saw SI with Behrendt.

LI testified that SI told her about her sexual relationship with Behrendt in March 2006, and LI called the police. Afterwards, LI and her daughter moved back to the Pumehana house.

### c. Testimony of Dr. Alexander Bivens

Dr. Alexander Bivens, Ph.D., testified for the State as an expert in the area of child and adolescent psychology, with a specializa-

tion in child sexual abuse. He testified that it is typical for a child who has been sexually abused to wait a very long time to tell anyone about it,[11] especially when they are assaulted by a family member,[12] and identified the methods typically used by an abuser to gain the trust of the child. These methods include spending a lot of time with the child, giving them attention, touching them non-sexually, telling them they are special, treating them like an adult, or tricking them into feeling safe with the abuser. Dr. Bivens also testified about four "primary processes" abusers utilize: (1) seduction and testing, which "involves taking normal adult-child touch, which would be a hug, a kiss, that sort of affectionate touching, . . . and slowly incorporating sexual touch"; (2) masking sex as a game, such as wrestling or tickling; (3) emotional-verbal coercion, in which the abuser talks about sex overtly or rewards for having sex, or tells the child that he or she will avoid punishment for other acts if the child has sex with the abuser; and (4) taking advantage of the child in a vulnerable position, such as approaching a child who is sleeping or who has just taken a bath.

### d. State's Other Witnesses

The State's other witnesses included a nurse who examined Behrendt in order to confirm testimony by SI that Behrendt had a distinctive freckle and unusually thick circumcision scar on his penis.

### 2. Defense Case
#### a. Behrendt's testimony

Behrendt denied having had any sexual interactions with SI. He "loved [SI] like a daughter" and "considered her [his] child." He would kiss SI ("a peck") like he used to do with his family. Behrendt testified that when SI lived with him and LI in South Dakota, he would take her to and from school

each day and help her with her homework when they got home. He and LI would take SI to the pool and LI always took SI to the girls' showers. Behrendt never took SI to the pool by himself, and the only time he showered with SI was at the beach in Hawai'i with their swimsuits on.

Behrendt testified that he and LI decided to move back to Hawai'i in the summer of 2002 to start a family. At the going away party at Trista's house, SI got upset after a boy walked by and went upstairs to the bathroom. He and LI went upstairs together to talk to her, and then Behrendt went back downstairs and LI stayed with SI. Trista later called them about a small hole in her bathroom wall, and even though Behrendt did not know how it got there, he fixed it for her.

Behrendt testified that when they returned to Hawai'i, they moved in with SI and LI's family, who was "like their own group" and "did their own thing." LI braided his hair until their daughter was born, and then SI took over. Behrendt would wake up at four in the morning for work, he would go into SI's room, "open up the curtains, sit down on the bed" and SI would braid his hair for ten minutes and then he would leave for work. He denied ever having a "romantic liaison" with SI or ever telling his daughter to call SI "mom."

Behrendt testified that in August or September 2004, he and LI discussed moving to Washington, but he did not want to go because he didn't have any money because "[LI] cleaned out" his bank account. Behrendt was "stressing out" because their "marriage [was] falling apart[,]" and "was extremely upset when [LI] left." After LI moved out, her parents told him to leave their house. Behrendt then lived in his car

---

11. Dr. Bivens indicated that the reasons a child may not disclose the abuse include: "fear for their own safety," feeling "ashamed" or "blam[ing] themselves," "trying not to think about the abuse," feeling like reporting would not help to end the abuse, or a fear of the "impact on their family."

12. Dr. Bivens testified that a brother-in-law living in the same home with, and abusing, the

child victim would be considered an incest situation. He further indicated that some abusers sexually assault the child with another non-collaborating adult present in the same bed because "[i]t help[s] the molester feel like a big guy, to be able to get away with it" or because they are "so sexually compulsive that they couldn't keep themselves from doing it."

for about a month, and moved into the Crazy Horse apartment on December 17, 2004.

Behrendt testified that SI never lived with him at the Crazy Horse apartment, and that he had never given her a key to the apartment. SI was dating Brandon at the time, and Behrendt was never jealous of Brandon. On January 15 or 16, 2005, LI and their daughter moved in with Behrendt, along with Behrendt's sister. Behrendt testified that he received a phone call from SI on January 17, 2005, they had a conversation, he talked to LI about it, and then he went back to sleep.

After his rental agreement terminated in June 2005, Behrendt moved to another place, and LI moved in with her parents. He and LI agreed that their marriage was over, and in November 2005, Behrendt started seeing another woman.

### b. Other Defense Witnesses

The defense called several other witnesses, including Behrendt's mother and two sisters (one of whom lived with SI, LI, and Behrendt for eight months in South Dakota), who testified that they did not notice anything unusual about the way Behrendt treated LI or SI. Rather, Behrendt treated SI like his little sister and hugged and kissed her like he did with all his siblings. One of his sisters also testified that she had found portions of SI's journal which described some sexual incidents between SI and Behrendt at the Aloha Kona house, and that SI subsequently told her that she made it all up to hurt LI. Additionally, a friend of Behrendt's testified that she became friends with SI, and that in November 2006, SI told her that she had lied in court about having sex with a guy named Running Bear.

### C. Jury Instructions and Verdict

#### 1. Jury Instructions

At the conclusion of trial, the circuit court instructed the jury with regard to the prior bad act evidence as follows:

> You have heard evidence that the defendant at another time, may have engaged in other wrongs or acts. You must not use this evidence to determine that the defendant is a person of bad character and

therefore must have committed the offenses charged in this case. Such evidence may be considered by you *only on the issue of the defendant's motive, opportunity, or intent and for no other purpose.*

(Emphasis added).

The circuit court also instructed the jury on the offense of sexual assault in the first degree, HRS § 707–730(1)(c), and the lesser included offense of sexual assault in the third degree, HRS § 707–732(1)(c). Defense counsel did not object to giving the lesser included offense instruction, but did object that the instruction did not correctly set forth the state of mind requirement.

After the jury began its deliberations, it sent the circuit court the following question: "What purpose do we put to the evidence and testimony from S. Dakota[?]" The circuit court responded by referring the jury to the instruction involving the prior bad act evidence referenced above.

#### 2. Verdict and motion for judgment of acquittal

The jury returned a verdict finding Behrendt: (1) guilty of the lesser included offense of sexual assault in the third degree on Counts 1, 2, and 3; and (2) guilty of the lesser included offense of unlawful imprisonment in the first degree, HRS § 707–721, on Count 4.

Behrendt filed a Motion for Judgment of Acquittal and a Motion for New Trial, arguing that there was no evidence presented of "sexual contact" between Behrendt and SI with respect to Counts 1–3, but rather only "sexual penetration." The circuit court denied the motion.

On April 16, 2008, the circuit court filed its Judgment, Guilty Conviction and Sentence, sentencing Behrendt to five years imprisonment.

### D. ICA Appeal

On appeal to the ICA, Behrendt raised eight points of error (only three of which are raised in his current application): (1) that the circuit court erred in admitting character evidence in violation of HRE Rules 404(b)

and 403; (2) that the circuit court erroneously admitted Dr. Bivens' expert testimony; (3) that the circuit court erred in permitting LI to testify regarding entries in her diary and in admitting her diary into evidence; (4) that the circuit court erred in refusing to stay the trial for one day due to the birth of Behrendt's child; (5) that the circuit court erred in instructing the jury on the lesser included offense of sexual assault in the third degree for Counts 1, 2, and 3 since there was no reasonable basis in the evidence to justify giving the instruction; (6) that the circuit court erred in providing the jury with an incorrect definition of "sexual contact" as to Counts 1, 2 and 3; (7) that there was insufficient evidence to support Behrendt's conviction for sexual assault in the third degree; and (8) that the circuit court's inclusion of the phrase "exact date is not required" in the jury instructions with regard to the incidents charged in Counts 1–4 amounted to plain error.

In its November 4, 2009 SDO, the ICA rejected Behrendt's argument with respect to prior bad act evidence, and concluded that:

[ ] The circuit court properly admitted evidence of Behrendt's prior bad acts under HRE Rule 404(b) as evidence of delayed reporting, preparation, planning, and common scheme. Delayed reporting was an issue of consequence in the trial because [SI's] silence over a two-year period of sexual abuse raised a serious issue as to her credibility. Additionally, Behrendt insinuated that [SI] conveniently came forward to help [SI's] sister [ ] win custody of [LI] and Behrendt's child from Behrendt.[13] The prior-bad-act evidence also explained a unique household dynamic that helped the trier-of-fact understand allegations of abuse in Hawai'i in general. The evidence was therefore relevant for a purpose other than mere propensity.

The circuit court's limiting instructions on the admission of this prior-bad-act evidence ameliorated any prejudice it may have created. We accordingly find no abuse of discretion.

(Citations omitted).

The ICA additionally rejected each of Behrendt's remaining points of error, with the exception of his sixth point regarding the definition of "sexual contact." Specifically, the ICA recognized that the definitions of "sexual contact" and "sexual penetration" had been amended effective May 10, 2004, and therefore, as to Count 3, the circuit court had provided the jury with the pre-amendment definitions. The ICA held that this error was not harmless, and therefore vacated Behrendt's conviction with respect to Count 3. The ICA concluded that there was sufficient evidence to prove that Behrendt engaged in "sexual contact" as to Count 3, and therefore remanded for a new trial on that count.[14]

The ICA filed its judgment on November 24, 2009, and Behrendt timely filed his application on February 22, 2010.

## E. Questions Presented

Behrendt's application presents the following questions:

1. Whether the ICA gravely erred in affirming Behrendt's convictions for Sexual Assault in the Third Degree and Unlawful Imprisonment [15] because:

 a. At trial, the court erroneously admitted character evidence in violation of Hawaii Rule of Evidence (HRE), rules 404(b) and 403;

 b. The circuit court erroneously instructed the jury on the included offense of Sexual Assault in the Third Degree in

---

13. This is an apparent reference to defense counsel's closing argument, in which counsel suggested that SI and LI had lied about the incidents of sexual contact between SI and Behrendt so LI could obtain custody of her daughter.

14. The ICA also concluded that the circuit court had a rational basis to instruct the jury on the lesser included offense of sexual assault in the third degree, and that there was substantial evidence to support Behrendt's convictions for Counts 1 and 2.

15. Although Behrendt provides extensive argument as to why his convictions for Counts 1, 2 and 3 cannot stand, he provides no further argument with respect to his conviction for Count 4. Therefore, Count 4 will not be further discussed. See Hawai'i Rules of Appellate Procedure Rule 40.1(d)(1).

Counts 1–3, where there was not reasonable basis in the evidence for these count [sic];

c. There was insufficient evidence to sustain Behrendt's conviction for three counts of Sexual Assault in the Third Degree.

## II. STANDARDS OF REVIEW

### A. Admissibility of Evidence under HRE Rules 401, 403 & 404(b)

 "Prior bad act" evidence under [HRE] Rule 404(b) ... is admissible when it is 1) relevant and 2) more probative than prejudicial. A trial court's determination that evidence is "relevant" within the meaning of HRE Rule 401 ... is reviewed under the right/wrong standard of review. However, a trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 ... is reviewed for abuse of discretion. An abuse of discretion occurs when the court clearly exceeds the bounds of reason or disregards rules or principles of law to the substantial detriment of a party litigant.

*State v. Fetelee,* 117 Hawai'i 53, 62–63, 175 P.3d 709, 718–19 (2008) (citation omitted).

### B. Jury Instructions

 The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. In other words, error is not to be viewed in isolation and considered purely in the abstract.

*State v. Kassebeer,* 118 Hawai'i 493, 504, 193 P.3d 409, 420 (2008) (quotation marks, citations, and brackets omitted).

### C. Sufficiency of the Evidence

 [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; . . . . The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (citation omitted). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (internal quotation marks and citation omitted).

## III. DISCUSSION

### A. General Principles Applicable to Admission of Evidence Under HRE Rule 404(b) and 403

HRE Rule 404(b) (Supp.2007) provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

 The rule prohibits the admission of evidence introduced for the sole purpose of establishing that a defendant possesses a criminal character and acted in conformity with that character. Although such evidence may not be used solely for the purpose of establishing criminal propensity, under certain circumstances it may be offered to prove other facts of consequence. *See State v. Kassebeer,* 118 Hawai'i 493, 506, 193 P.3d 409, 422 (2008). Such facts include, but are

not limited to, "motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident." HRE Rule 404(b). "The list of permissible purposes in Rule 404(b) is not intended to be exhaustive 'for the range of relevancy outside the ban is almost indefinite.'" *State v. Clark*, 83 Hawai'i 289, 300–01, 926 P.2d 194, 205–06 (1996) (citation omitted); *State v. Cordeiro*, 99 Hawai'i 390, 414, 56 P.3d 692, 716 (2002). "Rule 404(b) was intended not to define the set of permissible purposes for which bad-acts evidence may be admitted but rather to define the *one impermissible* purpose for such evidence ....: a person who commits a crime probably has a defect of character; a person with a defect of character is more likely than people generally to have committed the act in question." *Clark*, 83 Hawai'i at 301, 926 P.2d at 206 (citation and brackets omitted; emphasis in original).

 When evidence is offered for substantive reasons rather than propensity, a trial court must additionally weigh the potential prejudicial effects of the evidence against its probative value under HRE Rule 403.[16] *See Kassebeer*, 118 Hawai'i at 507, 193 P.3d at 423; Commentary to HRE Rule 404 (stating that if offered for "specified purposes other than mere character and propensity ... 'other crimes, wrongs, or acts' evidence may be admissible provided the Rule 403 test is met").

In *State v. Castro*, 69 Haw. 633, 756 P.2d 1033 (1988), this court discussed the dangers of admitting propensity evidence, and stressed the need for courts to apply this balancing test even when evidence is substantively relevant:

The framers of the rule recognized that "[c]haracter evidence is of slight probative value and may be very prejudicial." For "[i]t tends to distract the trier of fact from the main question of what actually happened on the particular occasion." And "[i]t ... permits the trier ... to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."

. . . .

Yet even when the evidence of other crimes, wrongs or acts tends to establish a fact of consequence to the determination of the case, the trial court is still obliged to exclude the evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." [HRE Rule] 403. For the use of the word 'may' in [HRE Rule] 404(b) was not intended to confer any arbitrary discretion on the trial judge but was rather designed to trigger the Rule 403 balance.

*Id.* at 643, 756 P.2d at 1041 (some brackets in the original; some internal quotation marks and citations omitted).

Therefore, we must determine (1) if the South Dakota evidence was probative of any fact of consequence other than character and propensity; and, if so, (2) whether the circuit court abused its discretion in determining that the probative value of the evidence substantially outweighed the danger of unfair prejudice to Behrendt.[17] *See* Addison M. Bowman, *Hawaii Rules of Evidence Manual* § 404–3[1] (2008–2009 ed.) [hereinafter Bowman]; *State v. Fetelee*, 117 Hawai'i 53, 62–63, 175 P.3d 709, 718–19 (2008) (" 'Prior bad act' evidence under HRE Rule 404(b) is admissible when it is 1) relevant and 2) more probative than prejudicial.") (citation, brackets and ellipses omitted); *State v. Renon*, 73 Haw. 23, 32, 828 P.2d 1266, 1270 (1992).

16. HRE Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

17. In conducting this analysis, we note that there is some variation between the purposes identified by the circuit court in its written order (motive, opportunity and plan) and in its instructions to the jury (motive, opportunity and intent). However, since we conclude that the evidence was probative of opportunity, which was identified by the circuit court both in its order and its instruction, that variation is not material in the circumstances of this case.

## B. Evidence of Sexual Contacts in South Dakota Was Probative of Opportunity

The State's evidence [18] established that the first charged incidents of sexual assault in Hawai'i occurred while SI, LI and Behrendt were living at the Kamani Trees house with SI's family. By that time, Behrendt and SI had been engaging in sexual intercourse for at least two years. The first sexual contact in Hawai'i occurred one night while SI was sleeping in the same bed with LI and Behrendt, and Behrendt turned SI on her side and had vaginal intercourse with her from behind. They continued to have sexual intercourse about three to five times a month while living at that house.

The prior sexual contacts between SI and Behrendt in South Dakota were relevant to establish Behrendt's opportunity to engage in the sexual contacts in Hawaii without being detected. The evidence established how the relationship between Behrendt and SI had developed so that the sexual contacts in Kona could take place without SI reporting them. Absent that evidence, it would be implausible that Behrendt could suddenly engage in sexual intercourse with SI in a house they shared with her family while SI's sister slept in the same bed, without SI reporting it.

Specifically, the evidence from South Dakota established that Behrendt had initially explored SI's willingness to engage in sexual conduct by first suggesting that they take showers together, then having her touch his penis in the shower, followed by him touching her genitalia, and then progressing to sexual intercourse.

The State's expert witness on child sexual abuse, Dr. Bivens, testified about a study involving interviews of approximately thirty child sexual offenders, who identified "seduction and testing" as a method they used to accomplish the abuse:

> ... Seduction and testing involves taking normal adult-child touch, which would be a hug, a kiss, that sort of affectionate touching, which I hope is happening between adults and children, and slowly incorporating sexual touch into.

> The classic example that's in the book is watching television, snuggling on the couch. And what the abuser will do is touch more frequently in more sexual ways. Now that's the seduction part. The testing part is that all the molesters reported that they were waiting and monitoring the reaction of the child. And what they reported was that they said that if the child was going to startle or somehow react in a way that let them know that they were going to get into trouble for it that they would have backed off completely.

The evidence also established that Behrendt developed a relationship of trust and control with SI in South Dakota. Behrendt was SI's primary caretaker when SI's sister was working, bought her things, and took her side when she had disagreements with her sister.[19] He assured her that their sexual touching was "okay" and that her sister said it was "okay" for them to shower together. Also, he showed her a pornographic videotape when they were alone together.[20]

18. This court may use evidence adduced at trial in order to determine whether the circuit court abused its discretion in granting, in part, the State's motion to reconsider the circuit court's grant of Behrendt's earlier motion in limine. *See, e.g., Miyamoto v. Lum*, 104 Hawai'i 1, 7, 84 P.3d 509, 515 (2004) ("The denial of a motion in limine, in itself, is not reversible error .... the real test is not in the disposition of the motion but in the admission of evidence at trial.") (internal quotation marks and citation omitted).

19. Dr. Bivens testified that abusers typically use various strategies to gain the trust of the child, such as spending a lot of time with the child, giving them attention, touching them non-sexually, telling them they are special, treating them like an adult, or tricking them into feeling safe with the abuser.

20. Dr. Bivens also testified about the significance of the display of pornography to a child:

> Introduction to pornography usually is put under the category of emotional and verbal coercion. It is usually regarded as a form of sexual abuse in and of itself. It clearly raises the topic of sexuality with the child. It will very likely lead to more sexualized behavior by the child, perhaps get the child to become interested in sexuality and things like that. It would certainly be lots of negative effects. ...

After their relationship became sexual, SI testified that at first she was "confused" and occasionally acted rude to Behrendt to "push[ ] him off." On those occasions, he would discipline her by putting her nose on the wall for a few minutes, or he and LI would threaten to send her back to Hawai'i.[21] Behrendt also repeatedly told SI that she could not tell about what was happening or he would be separated from her and would go to jail.

SI testified that by the time that SI, her sister and Behrendt returned to Kona, she had grown close to Behrendt and "started liking him" because he was there for her as a friend:

> ... I told him everything. [He] [b]ought me stuff. If anytime there was an argument, like an argument between me and my sister or something, it seems like he stuck up for me. Or even when we got back to my parents, my parents—all of us, we would argue about something or just have a disagreement, and he was always sticking up for me, like he was there for me.

In sum, by the time that SI returned to Hawai'i, SI had become acclimated to the sexual contact. Her relationship with Behrendt had developed from the early stages when she would occasionally act rudely and "push him off," to the point where she had grown close to him and "started liking him, because he was there for me." Thus, when Behrendt had sex with SI at Kamani Trees while her sister slept in the same bed, it was another contact in an established sexual relationship. SI's failure to cry out or tell anyone what had occurred that night and on the subsequent occasions of sexual contact in Hawai'i was consistent with the relationship that had been established in South Dakota. Thus, the evidence of the sexual contacts in South Dakota was relevant to show Beh-

rendt's opportunity to commit the charged sexual assaults in Hawai'i without being detected.

There are no Hawai'i cases involving child sexual abuse that address the admissibility of the defendant's prior sexual interaction with the complaining witness. However, cases from other jurisdictions have held that such evidence is admissible under rules comparable to HRE Rule 404(b). *See, e.g., State v. Cox,* 169 P.3d 806, 813–14 (Utah Ct.App. 2007) (holding that evidence of an uncharged incident of sexual conduct was admissible to demonstrate an ongoing pattern of behavior by the defendant toward one particular victim) (citing *State v. Reed,* 8 P.3d 1025, 1030–32 (Utah 2000) (concluding that evidence of specific uncharged instances of the defendant's treatment of the child "demonstrated the manner in which [the defendant] intensely pursued the victim over a three-and-a-half year period in order to gain opportunity to commit the unlawful sexual acts")); *State v. Baptista,* 894 A.2d 911, 915–16 (R.I.2006) (holding that evidence of uncharged sexual assaults against defendant's step-daughter over a period of two and a half years was admissible to show the defendant's intent and lewd disposition toward the particular child victim); *State v. Paul,* 769 N.W.2d 416, 425–26 (N.D.2009) (approving trial court's admission of evidence that defendant made complaining witness watch "nasty movies" and engaged in sexual conduct with her in another state prior to the charged conduct as probative of plan and preparation).[22]

In sum, the State clearly articulated a legitimate purpose for the evidence, i.e., establishing Behrendt's opportunity to commit the offenses in Hawai'i without being detected. Both the testimony of SI and the testimony of Dr. Bivens provided the evidentiary foundation for that non-character use of the evidence. Thus, this is not a situation where the state offered a pretextual reason for the

---

**21.** Dr. Bivens testified that "emotional and verbal coercion" is another common strategy used by child sexual abusers, in which the abuser will "talk about rewards for having sex or withdrawal with punishment. I won't punish you for being late if you give me some sex, that type of thing."

**22.** We note that some of the purposes identified by these courts are overlapping. Thus, when a

defendant engages in behavior that culminates in a sexual relationship with a child, the evidence of that behavior could be admissible to show that defendant had a plan (to gain the child's trust and acquiescence), engaged in preparation (by seducing and testing the child) and did so in order to have the opportunity to engage in sexual conduct with the child without being detected.

admission of the evidence, but in fact appeared to be using it to establish the bad character of the defendant. *Cf. Fetelee,* 117 Hawai'i at 82–85, 175 P.3d at 738–741 (in case of attempted murder, attempted assault and theft, concluding that evidence of an unrelated prior incident where the defendant entered his neighbor's apartment and punched a visitor would likely cause the jury to "infer[ ] that [the defendant] was a violent person of bad character" and was therefore not admissible under HRE 404(b)).

Accordingly, we conclude that the evidence of sexual contacts in South Dakota was relevant to establish opportunity.[23]

## C. The Probative Value of the Evidence of Sexual Contacts in South Dakota Was Not Outweighed by Any Prejudicial Effect

We next consider whether the probative value of the evidence was "substantially outweighed" by the danger of unfair prejudice to Behrendt. HRE Rule 403. When weighing probative value versus prejudicial effect in this context, a court must consider a variety of factors, including:

> ... the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*State v. Renon,* 73 Haw. 23, 38, 828 P.2d 1266, 1273 (1992) (citation omitted).

In the instant case, these factors weigh in favor of admission of the evidence. The strength of the evidence of the uncharged conduct is essentially the same as for the charged offenses, since the State relied primarily on the testimony of SI, together with the testimony of her sister and the observations of some other witnesses, to establish

both the conduct in South Dakota and the conduct in Hawai'i. *Cf. Reed,* 8 P.3d at 1030–32 (concluding that evidence of both charged and uncharged instances of the defendant's sexual contact with the child victim "were essentially interchangeable, were of the same nature and character as the primary offense, and were carried out on the same victim during the same uninterrupted course of conduct[,]" and therefore the probative value of the evidence of the uncharged instances outweighed the prejudicial effect).

The similarities between the crimes were strong, since the conduct in South Dakota was in substance the same as that in Hawai'i, i.e., alleged sexual contact between SI and Behrendt. And although the South Dakota conduct took place over a several-year period, it immediately preceded the conduct in Hawai'i and thus was not remote in time. *Cf. State v. Maelega,* 80 Hawai'i 172, 183, 907 P.2d 758, 769 (1995) (holding that the trial court did not abuse its discretion in concluding that prior bad act evidence was more probative than prejudicial; the trial court noted, inter alia, that *"very little time [ ] elapsed between the prior act evidence and the instant offense charged "*) (emphasis added).

There was also a substantial need for the evidence. We have previously emphasized "the importance of the need factor," *Clark,* 83 Hawai'i at 303, 926 P.2d at 208 (citations omitted), and one commentator has observed that in a case involving "high relevance and strong need, the rule 403 balance will always favor admissibility." Bowman § 404–3[2][B]. Absent the evidence of sexual contacts between SI and Behrendt in South Dakota, the jury would have been left with the false impression that the sexual contact started at Kamani Trees. SI's failure to cry out when Behrendt had sexual intercourse with her the first time at Kamani Trees, as her sister slept nearby, and her failure to report that incident as well as the subsequent incidents,

---

**23.** Since we conclude that the evidence was relevant to establish opportunity, we need not determine whether the other purposes identified by the circuit court were relevant in these circumstances. *Cf. State v. Austin,* 70 Haw. 300, 305–08, 769 P.2d 1098, 1101–02 (1989) (trial court instructed the jury that it could consider evidence of the defendant's prior uncharged acts for seven purposes delineated in HRE 404(b); this court concluded that the trial court properly admitted the evidence of prior uncharged offenses under HRE 404(b), analyzing two of the seven purposes).

would have been inexplicable, as would the fact that Behrendt would suddenly engage in such conduct after having lived in close proximity to SI for three years.

This court has previously recognized that testimony regarding a defendant's prior bad acts can be highly probative in understanding the conduct of a complaining witness in a sexual assault case. In *State v. Iaukea*, 56 Haw. 343, 537 P.2d 724 (1975), the complaining witness was a psychiatric social worker who was abducted and raped by the defendant. The complaining witness knew of the defendant's prior acts of violence and rape while treating him as part of her duties. *Id.* at 352, 537 P.2d at 731. She testified that she remained calm during the assault, both because of her training in how to deal with crisis situations, and because she was afraid of provoking the defendant to violence given what she knew about his past. *Id.* at 347, 537 P.2d at 728. This court held that her testimony about her knowledge of defendant's prior bad acts was relevant to show lack of consent, and noted that:

> The testimony of the complaining witness concerning the prior crimes which, to her knowledge, appellant had committed, credibly explained and placed in context many of her statements to and actions toward him. Her fear of the appellant was in part due to his past history of attacks on women. The complaining witness made every effort to remain calm and to refrain from screaming because of her training as a psychiatric social worker. In her judgment she had a better chance of avoiding serious bodily injury if she remained calm. She feared that he would 'cut her up' if she 'tried to fight him.'
>
> It was important that the jury know all of the facts involved so that they would not mistakenly construe the complaining witness's calm manner and lack of screaming as indicative of consent or lack of forcible compulsion.

*Id.* at 352, 537 P.2d at 731.

While the issue in *Iaukea* was lack of consent, and the issue here concerns SI's failure to promptly report the sexual contacts in Hawai'i, nevertheless the underlying principle is the same: there is a substantial need for prior bad acts evidence when the exclusion of that evidence will create a false impression by the jury regarding the actions of the complaining witness.

The next Rule 403 factor, the efficacy of alternative proof, also weighs in favor of admitting the South Dakota evidence. There was no alternative way to establish the progression of Behrendt's behaviors, including his seduction and testing of SI and his development of a relationship of trust and control over her as their sexual relationship evolved. Although there was evidence that showed Behrendt's continued, and indeed, intensified efforts to maintain his relationship of trust and control with SI after they returned to Hawai'i, that evidence would be likely to confuse rather than enlighten the jury absent the context provided by the prior conduct in South Dakota.

Finally, the evidence of the conduct in South Dakota was not likely to rouse the jury to an overmastering sense of hostility against Behrendt. The conduct in South Dakota was of the same general type and involved the same complaining witness as the conduct in Hawai'i. The jury heard testimony from SI about numerous sexual encounters between SI and Behrendt in Hawai'i, including acts of sexual intercourse preceded on most occasions by SI licking Behrendt's penis "to get it wet," and an occasion when Behrendt attempted to or did insert his penis in her anus. As the Court of Appeals of Utah noted:

> [T]he evidence was not unfairly prejudicial because [the complaining witness's] testimony regarding the [uncharged] sexual abuse that occurred in Wasatch County was essentially interchangeable with and of the same nature and character as her testimony regarding Defendant's [charged] conduct in Salt Lake County. Such evidence of multiple acts of similar or identical abuse is unlikely to prejudice a jury; jurors will either believe or disbelieve the testimony based on the witness's credibility, not whether the witness asserts an act occurred [an additional time].

*Cox*, 169 P.3d at 814 (quotations and citations omitted, some brackets in original and some added).

The primary difference between the sexual conduct in Hawai'i and that in South Dakota was that the South Dakota conduct occurred while SI was several years younger, and, according to SI, occurred more frequently than in Hawai'i. Those are relevant considerations which could, depending on the circumstances, provide a basis for limiting such evidence or excluding it altogether. However, we do not believe that they caused "overmastering hostility" in the circumstances of this case, particularly since the State did not argue in closing that SI's age at the time of the South Dakota contacts made Behrendt's conduct more culpable or reprehensible, and since there was evidence of a substantial number of contacts in Hawai'i over a period of about two years.

We further note that the potential for juror confusion here did not tip the balance against admission of the evidence. *See* HRE Rule 403. As noted above, the jury did send a question to the court regarding how to use the testimony and evidence from South Dakota. However, the court responded appropriately by referring the jury back to the court's limiting instruction regarding the permissible purposes for that evidence, and there were no further questions from the jury on that subject. The fact that the jury had a question, without more, does not establish that the jury was confused. To the contrary, it is not surprising that the jury asked for clarification, since the court's instruction did not specifically state that it was referring to the evidence from South Dakota. By referring the jury back to that instruction in response to its question, the court clarified that the instruction covered the South Dakota evidence, and there is no basis for concluding that the admission of the South Dakota evidence resulted in any prejudicial jury confusion.

In sum, this court has stated that "the determination of the admissibility of relevant evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion because it requires a cost-benefit calculus and a delicate balance between probative val-

ue and prejudicial effect." *Clark*, 83 Hawai'i at 302, 926 P.2d at 207 (citations omitted). The circuit court here carefully considered that balance. It required the State to give a detailed description of the evidence prior to trial, and refused to admit some of the proposed testimony.[24] We cannot say that the circuit court abused its discretion in concluding that the probative value of the evidence it admitted was not outweighed by its prejudicial effect.

**D. There Was Sufficient Evidence to Instruct the Jury on the Lesser Included Offense of Sexual Assault in the Third Degree for Counts 1–3, and to Sustain Behrendt's Convictions**

Behrendt argues that the circuit court erred in instructing the jury on the offense of sexual assault in the third degree because "[t]he only evidence that was presented by the State in regard to sexual assault was evidence of repeated *sexual penetrations*," which would constitute first degree sexual assault. Behrendt similarly argues that there was insufficient evidence to support his convictions for Counts 1–3 and therefore the circuit court erred in denying his motion for judgment of acquittal.

HRS § 707–730(1)(c) provides that a person commits the offense of first degree sexual assault when "[t]he person knowingly engages in sexual penetration with a person who is at least fourteen years old but less than sixteen years old; provided that: (i) The person is not less than five years older than the minor; and (ii) The person is not legally married to the minor; . . . ." HRS § 707–732(1)(c) defines the offense of third degree sexual assault the same way as HRS § 707–730(1), except that a person commits the offense of third degree sexual assault by engaging in "sexual contact" rather than "sexual penetration."

As noted above, part I.D, the ICA concluded that there was sufficient evidence to support Behrendt's convictions on all counts, but remanded for a new trial on Count 3 because of the circuit court's failure to properly in-

---

24. As noted above, the circuit court concluded that the testimony of two of the State's proposed witnesses was inadmissible because it would be cumulative and the prejudicial value would outweigh the probative value. *See supra*, part I.A. & note 7.

struct the jury on the amended definition of "sexual contact." [25] The State did not appeal the ICA's conclusion with respect to Count 3, nor does Behrendt address it in his application. Therefore, we must determine whether there was a rational basis for the circuit court to instruct the jury on sexual assault in the third degree for Counts 1 and 2, *see State v. Kinnane*, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) ("in the absence of [ ] a rational basis in the evidence, the trial court should not instruct the jury as to included offenses") (emphasis omitted), and whether there was sufficient evidence to support Behrendt's convictions on all three counts. We conclude that there was, and therefore affirm the ICA.

The definition of "sexual contact" in HRS § 707–700 (both the current definition, effective during the time period covering Count 3, and the definition prior to the 2004 amendments, effective during the time period covering Counts 1 and 2), states that "sexual contact" includes *"any touching"* "of the *sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person,* whether directly or through the clothing or other material intended to cover the sexu-

al or other intimate parts." HRS § 707–700 (1993 & Supp.2004) (emphasis added).

SI testified that she and Behrendt repeatedly engaged in sexual intercourse over the time periods covered by Counts 1–3. SI also recounted some of the specific instances in which they had intercourse. For example, at a time when living at the Kamani Trees house (Count 1), SI testified that she was sleeping one night and Behrendt "turned me around and he had sexual intercourse with me in the back." When living at the Aloha Kona house (Count 2), SI recounted a time when Behrendt asked her if she "wanna do it" and "[Behrendt] just did sexual intercourse from behind" where SI "was over the bed, standing up, leaning over." Also while living at the Aloha Kona house, SI testified that Behrendt would take her to a construction site nearby and they would have sexual intercourse in the car, where "he would have me sit on top of him, where he's behind me, or he would have me straddle him." SI also recounted a time when Behrendt took her to a nearby construction and "had me in the car, in the back seat, and I just ... was ... like bent over the back seat, and he was

---

**25.** As explained by the ICA, the definitions of both "sexual contact" and "sexual penetration" were amended in 2004, in response to this court's holding in *State v. Mueller*, 102 Hawai'i 391, 76 P.3d 943 (2003), which overruled this court's previous holding in *State v. Rulona*, 71 Haw. 127, 785 P.2d 615 (1990).

Prior to 2004, "sexual penetration" was defined as:

vaginal intercourse, anal intercourse, fellatio, cunnilingus, anilingus, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs upon any penetration, however slight, but emission is not required.

HRS § 707–700 (Supp.1986 & 1993).

"Sexual contact" was defined as:

any touching of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

HRS § 707–700 (Supp.1987 & 1993).

In *Mueller*, involving alleged acts of cunnilingus, this court held that the plain language of HRS § 707–700, specifically the phrase "it occurs upon any penetration, however slight," "mandates proof of 'penetration[,]' " in order to convict for sexual assault in the first degree for

acts of cunnilingus. 102 Hawai'i at 393, 76 P.3d at 945. Thereafter the legislature amended the definitions of "sexual penetration" and "sexual contact" in HRS § 707–700, effective May 10, 2004, for the purpose of clarifying that the definition of "sexual penetration" would include cunnilingus and anilingus whether or not actual penetration occurred. 2004 Haw. Sess. Laws Act 61, § 2 at 302–03.

The definition of "sexual penetration" was therefore amended to read as follows:

(1) Vaginal intercourse, anal intercourse, fellatio, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs upon any penetration, however slight, but emission is not required; or

(2) *Cunnilingus or anilingus, whether or not actual penetration has occurred.*

HRS § 707–700 (Supp.2004) (emphasis added).

The definition of "sexual contact" was amended to read as follows:

any touching, *other than acts of "sexual penetration",* of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

HRS § 707–700 (Supp.2004) (emphasis added).

behind me[,]" and then Behrendt inserted his penis into SI's vagina. SI also testified that Behrendt also took her in a rental car to a different construction site in Kaloko where they had sexual intercourse, and then Behrendt asked SI if she wanted to "do anal" and told her that it wouldn't hurt and other girls do it. The DPA asked SI if Behrendt "attempt[ed] it" and SI replied "[y]es" and that "he put his penis in my anal, my butt."

Although this testimony indicates that there were incidents of sexual penetration between SI and Behrendt, which would support a conviction for sexual assault in the first degree, a rational juror could have inferred that there was "sexual contact" prior to the penetration, i.e., that there was "touching" of "the sexual or other intimate parts" of SI, such as SI's genitalia, buttocks, or other intimate parts, either directly or through clothing, or that SI touched Behrendt's "sexual or other intimate parts." HRS § 707–700. This testimony, therefore, provided a rational basis to instruct the jury on sexual assault in the third degree, *Kinnane*, 79 Hawai'i at 49, 897 P.2d at 976, and, when considered in the strongest light for the prosecution, was also sufficient to sustain Behrendt's convictions. *Richie*, 88 Hawai'i at 33, 960 P.2d at 1241.

## IV. CONCLUSION

The circuit court properly admitted the South Dakota evidence because the evidence was probative of Behrendt's opportunity to commit the offenses in Hawai'i without being detected, and its probative value outweighed any prejudicial effect.

We further hold that the circuit court did not err by instructing the jury on the lesser included offense of sexual assault in the third degree, and that there was sufficient evidence to support the convictions on Counts 1–3.

Accordingly, we affirm the ICA's November 24, 2009 judgment.

1. The Honorable Elizabeth A. Strance presided.

2. Although I would remand for a new trial on all four counts on the basis that the court erroneously admitted evidence of prior bad acts, I agree with the ICA's conclusion that, with regard to Count 3, the court's failure to instruct the jury on

Dissenting Opinion by ACOBA, J.

I respectfully dissent.

In my view, the convictions of Petitioner/Defendant–Appellant Robert James Behrendt, also known as Running Bear, (Petitioner) for three counts of sexual assault in the third degree, Hawai'i Revised Statutes (HRS) § 707–732 (Supp.2002) (Counts 1–3), and one count of unlawful imprisonment in the first degree, HRS 707–721 (1993) (Count 4), should be vacated on the basis that the Circuit Court of the Third Circuit[1] (the court) improperly admitted evidence of Petitioner's prior bad acts in violation of Hawai'i Rules of Evidence (HRE) Rules 404(b) (Supp.1994) and 403 (1993). Evidence of Petitioner's prior bad acts is not relevant, and assuming *arguendo* its relevance, the prejudicial effect of the evidence outweighs its probative value, the presentation of such evidence created a substantial risk that the evidence would confuse the jury as to the proper issue before it, and the evidence was needlessly cumulative. This case should be remanded for a new trial on all four counts for which Petitioner was convicted inasmuch as the evidence of prior bad acts likely interfered with the jury's deliberations as to all Counts. With regard to remanding Petitioner's case, although I agree with the majority that there was substantial evidence in the record to support convictions as to the lesser included offense of sexual assault in the third degree for Counts 1–3, I disagree with the majority's theory that the acts of sexual penetration of which Petitioner was acquitted support the inference that Petitioner engaged in sexual contact with the minor complaining witness (complainant). In sum, I would vacate the judgment of the Intermediate Court of Appeals (ICA) affirming the decision of the court, and remand the case for a new trial.[2]

## I.

On March 24, 2007, the grand jury charged Petitioner with three counts of Sexual As-

the amended definition of sexual contact was not harmless error, and thus, Count 3 must be remanded. *State v. Behrendt*, No. 29191, 2009 WL 3653563, at *4 (Haw.App. Nov. 4, 2009) (SDO). *See infra* note 5.

sault in the First Degree, and with one count of kidnapping under HRS §§ 707–720(1)(d) (Supp.2004) and 707–720(1)(e) (Supp.2004).[3] Although the acts forming the bases for the charges occurred entirely in Hawai'i, Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) submitted its Notice of Intent to Use Specified Evidence, consisting of allegations that Petitioner had engaged in uncharged sexual acts with complainant outside of this state. Petitioner filed a Motion in Limine to exclude the evidence, arguing that the evidence did not go towards proving motive, purpose, or intent, but rather, only served to establish Petitioner's propensity to engage in such acts in violation of HRE Rule 404(b), and alternatively, that the prejudicial effect of such improper evidence outweighed its probative value and should have been excluded pursuant to HRE Rule 403.

After the court initially granted Petitioner's motion to exclude the evidence, Respondent filed an Amended Notice of Intent to Use Evidence Pursuant to HRE Rule 404(b) & Motion to Reconsider (Motion to Reconsider), which the court granted in part. In its written order, the court explained

> that the issue of "delayed reporting" is squarely before the jury, as well as possible issues of consent concerning the kidnapping charge. The [c]ourt finds that the "other bad acts" allegedly committed outside the State of Hawaii as described by [complainant, her sister (sister),] and Trista Borgwardt, *are relevant to show motive, opportunity, and plan.*

(Emphasis added.) The court further concluded that the prejudice in admitting such evidence did not outweigh its probative value, "and that a cautionary instruction ameliorates any prejudice." However, the tran-

scripts of complainant's testimony do not indicate that the court gave a cautionary instruction to the jury before complainant testified.

The court's jury instruction regarding evidence of acts occurring outside of this state and the purposes for which it could be considered differed from the reasons given in the court's written order granting the Motion for Reconsideration. In the written jury instruction, the court explained that the evidence could only be considered for the limited purposes of proving Petitioner's "motive, opportunity, or intent[.]" The instruction stated:

> You have heard evidence that [Petitioner] at one time, may have engaged in other wrongs or acts. You must not use this evidence to determine that [Petitioner] is a person of bad character and therefore must have committed the offenses charged in this case. Such evidence may be considered by you *only on the issue of [Petitioner's] motive, opportunity, or intent* and for no other purpose.[4]

(Emphasis added.) On February 13, 2008, the jury returned a verdict of guilty of the lesser included offense of sexual assault in the third degree as to Counts 1–3 and a verdict of guilty of the lesser included offense of unlawful imprisonment as to Count 4.

On appeal to the ICA, Petitioner raised eight points of error. *Behrendt*, 2009 WL 3653563, at *1. With regard to those points of error relevant to Petitioner's Application to this court, the ICA affirmed Petitioner's conviction on Counts 1, 2 and 4, but vacated his conviction for Sexual Assault in the Third Degree on Count 3 and remanded for a new trial on that count. *Id.* at *5.[5]

---

3. Although Petitioner was charged with the offense of kidnapping, HRS § 707–720, for Count 4, he was ultimately convicted of the lesser included offense of unlawful imprisonment in the first degree, HRS § 707–721. Petitioner does not challenge the sufficiency of the evidence to convict on that basis, but argues that the prejudice stemming from the admission of prior bad acts affected the jury's deliberations with regard to all counts. Because the facts relating to Petitioner's conviction for unlawful imprisonment in the first degree are not relevant to the issue of admitting the prior bad acts, those facts are not recounted in this opinion.

4. Clearly, it was plain error for the court to instruct on the issue of "intent," inasmuch as it did not grant the motion to use prior act evidence to prove "intent."

5. The ICA explained that during the time period the acts in Count 3 allegedly took place, the legislature amended the HRS definitions for "sexual penetration" and "sexual contact." *Behrendt*, 2009 WL 3653563, at *3. It noted that the court had provided the jury with the same definitions for "sexual penetration" and "sexual contact" for all three of the related counts. However, the ICA concluded that the jury should have

In his Application to this court, Petitioner raises, *inter alia*, the question of "[w]hether the ICA gravely erred in affirming [Petitioner's] convictions for Sexual Assault in the Third Degree and Unlawful Imprisonment because ... [a]t trial, the court erroneously admitted character evidence in violation of [HRE R]ules 404(b) and 403."

## II. Testimony

### A. Sister

Sister testified that when complainant moved to South Dakota to live with her and Petitioner, Petitioner took care of her after school, before sister got home from work.[6] According to sister, Petitioner said that he was showering with complainant at the indoor pool showers at their apartment, as well as taking showers together in the house. Sister related that she advised Petitioner that it was inappropriate to take showers with complainant. Prior to moving back to Hawai'i, sister observed Petitioner kissing complainant and "putting his arms around her ... [acting] just like a boyfriend and girlfriend." Also, sister indicated that she, Petitioner, and complainant visited a cousin in Washington, and while there, all three slept in the same bed. According to sister, during the visit, she noticed that Petitioner and complainant were acting "weird with each other[,]" so she stayed up to observe them. While in bed, sister heard Petitioner tell complainant to "get on top" of him, to which complainant responded that she would not. However, sister then "saw [complainant] on top of [Petitioner]" and heard complainant say "ouch."

When asked if she confronted Petitioner that night, sister stated that she did not because she was "so nervous" that she "didn't know what to do" and "was scared of the fact of what was happening." The next morning sister asked complainant if there was "anything going on" between her and Petitioner, to which complainant responded that there was not.

According to sister, the sexual relationship between complainant and Petitioner continued while in Hawai'i. After moving back to Hawai'i, sister confronted Petitioner about his involvement with complainant, to which he responded that "it was his culture and that [sister] was ruining his culture because he's Native American. And that in the mainland, they used to do that all the time, hold hands and nobody said anything." Sister testified that, in Hawai'i, "[w]herever [Petitioner and complainant] went, they were always together. They were always holding hands. You know, his arms was [sic] always around her or her arms around him. And they were still taking showers together." When she asked Petitioner about this, sister stated he became upset, "telling [her] that [she] was selfish and [she] was ruining everything ... he wanted to do. And that [she] was interfering with both of them."

Sister also indicated that Petitioner had tried to "home school" complainant, and was taking complainant to work with him because, according to him, "she didn't want to be around the family." Sister observed that, at the Aloha Kona house, Petitioner would regularly go into complainant's area in the living room in the middle of the night to be with her.

### B. Complainant

### 1.

Complainant recounted that she moved to South Dakota when she was eleven to live with sister and Petitioner. Her first sexual encounters with Petitioner occurred approximately four months after she moved to the mainland to live with Petitioner and sister. Initially Petitioner was the person who

---

been instructed on the amended definitions for Count 3 inasmuch as the definitions had changed during that time and that the failure to do so was not harmless error. *Id.* at *4.

**6.** With regard to sister's testimony, the court gave the following cautionary instruction:

Ladies and gentlemen of the jury, you are about to hear evidence that [Petitioner] may have engaged in other crimes, wrongs, or acts. You must not use this evidence to determine that [Petitioner] is a person of bad character and, therefore, must have committed the offenses charged in this case. Such evidence may be considered on the issues of [Petitioner's] motive, opportunity, and intent and for no other purpose.

looked after her, picking her up from school and staying with her until sister came home. Complainant's testimony indicated that she and Petitioner began showering together, to which she acquiesced after he told her that sister "said it was okay."

When asked if complainant actually believed that sister had approved of her showering naked with Petitioner, she stated that she did and that she "trusted him" when he told her that. Complainant said that while in the shower he asked her to touch his penis, and eventually inserted it into her vagina. According to complainant, Petitioner asked her if the penetration hurt, to which she responded that it had not hurt, despite asserting at trial that it did. When asked why she told Petitioner that it did not, complainant explained, "I was afraid if I told him the wrong answer, I guess." When asked if at the time she thought Petitioner's actions were similar to previous sexual abuse she experienced from her uncle, she answered, "Yes and no," and explained as follows:

> Yes because he was touching me, and it reminded me of what my uncle did.... And no because I was thinking it was okay. Still, it was in my mind that it was okay because he told me it was okay.... And I was still thinking about how[, according to Petitioner,] my sister was saying it was okay.

Complainant stated that, at that time, she felt like she "loved [Petitioner] as a brother[,]" but that there was something wrong about the relationship. According to complainant, Petitioner told her that, if she told anyone about their relationship, he would go to jail.

### 2.

Count 1 covered the time period in which complainant, sister, and Petitioner moved back to Hawai'i and lived in complainant's parent's house, also known as the Kamani Trees house. Complainant testified that at the time she had a close "[f]riendship" with Petitioner. She stated,

> I told him everything. [H]e [b]ought me stuff. If anytime there was an argument, like an argument between me and my sister or something, it seems like he stuck up

for me. Or even when we got back to my parents, my parents—all of us, we would argue about something or just have a disagreement, *and he was always sticking up for me, like he was there for me.*

(Emphasis added.) While staying in that house, complainant was sleeping in the same bed as sister and Petitioner and she recounted that her first sexual encounter with Petitioner in Hawai'i occurred while she was sleeping with Petitioner and sister. Complainant testified that she had sexual relations with Petitioner approximately three to five times per month in either the bedroom or the bathroom. She further related that any time she would have sexual intercourse with Petitioner, complainant would also "lick" or "suck" on Petitioner's penis to "get it wet with [her] saliva."

Count 2 related to the period of time when complainant lived with sister and Petitioner at the Aloha Kona house. At that time, complainant lived in a curtained off area in the living room. She testified that Petitioner had sex with her there "on more than one occasion[.]" Complainant reported that Petitioner would come into her curtained off area at night and ask if she wanted to have sex. She testified that Petitioner would also come into the area early in the morning before he left for work to have her braid his hair. According to complainant, during those times, he would talk to her, telling her "[h]ow much he loved [her]. What [sister] was doing, what they argued about, if they did. What—how he [did not] like [complainant's] parents, because sometimes [they] would bug [her] to go to school and [she] wouldn't." Complainant indicated Petitioner told her that her "parents [were] trying to take [her] away from him[,]" and that she believed him. She further recounted that she had sexual intercourse with Petitioner approximately once or twice a week, sometimes in complainant's area and sometimes in Petitioner's room. Complainant explained that at other times Petitioner would take her in the car to some other place to have sex with her.

Count 3 covered the period of time when complainant, sister, and Petitioner were living at the Pumehana house, again with complainant living in a curtained area. Petition-

er's practice of driving complainant to other places to have sexual intercourse continued while they were living there, but the frequency of their sexual encounters had decreased. Complainant also testified that at that time, her relationship with sister deteriorated because they "were fighting for attention from [Petitioner]. Also, [sister] had a feeling of something [sic] was going between [complainant and Petitioner]." According to Complainant, she and sister rarely spoke to one another, and Petitioner was telling complainant that sister did not want her to be with Petitioner.

At trial, complainant indicated that she began to call Petitioner "[h]igna[,]" the Lakota Indian name for husband. Petitioner also told her that the men in the Lakota culture typically "had two wives" who were sisters. When she tried to distance herself from him, complainant said she found it difficult because "[i]t still felt like [Petitioner] was in control of [her], like he was [her] dad or [her] brother[,] . . . an older person who was taking care of [her.]"

### C. Petitioner

With regard to the allegations of prior bad acts occurring on the mainland, Petitioner testified that complainant came to live with him and sister when she was eleven. They enrolled complainant in a nearby school and Petitioner would pick complainant up after school each day and look after her in the afternoon. Petitioner described the swimming pool at their apartment complex in South Dakota, asserting that he and complainant would sometimes go with other friends and neighbors, but that he and complainant never went there by themselves. According to Petitioner, the showers at the pool were in the different bathrooms assigned for men and women, so they never showered together or at any other time.

Petitioner testified that when he, sister, and complainant moved back to Hawai'i, he wanted complainant to live with her parents,

but complainant wanted to stay with him and sister. According to Petitioner, complainant did not feel close to her parents and they were not involved in her life. He also related that complainant wanted to be home schooled, and he and sister both helped her to do so. Petitioner testified to working at several jobs, some of which required him to wake up early in the morning. He stated that sister braided his hair in the morning before he went to work, but that changed after her child was born, so Petitioner would go into complainant's room to have her do it. Petitioner denied having any "romantic liaison[s]" with complainant.

### III.

As the commentary to HRE Rule 404 explains, the rule "operates to exclude generally evidence of a person's character 'for the purpose of proving that he acted in conformity therewith on a particular occasion.'" The reason for excluding character evidence is that it " 'is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from *the main question of what actually happened on the particular occasion.*'" Commentary to HRE Rule 404 (quoting Advisory Committee's Note to Fed. R.Evid. Rule 404) (emphasis added). The HRE sets forth a two-step analysis for determining whether evidence of prior bad acts is admissible. " 'Prior bad act' evidence under HRE Rule 404(b) is admissible *when it is 1) relevant and 2) more probative than prejudicial.* A trial court's determination that evidence is 'relevant' within the meaning of HRE Rule 401 (1993) . . . is reviewed under the right/wrong standard of review." *State v. Fetelee,* 117 Hawai'i 53, 62, 175 P.3d 709, 718 (2008) (quoting *State v. Cordeiro,* 99 Hawai'i 390, 403–04, 56 P.3d 692, 705–06 (2002)) (internal citation, brackets, and ellipsis omitted) (emphasis added). The first step requires that the court determine whether the evidence is relevant. HRE 404(b) [7] provides,

---

7. HRE Rule 404(b) provides in relevant part:
 Evidence of other crimes, wrongs, or acts *is not admissible to prove the character of a person in order to show action in conformity therewith.* It may, however, be admissible *where such evidence is probative of another fact that is*

*of consequence* to the determination of the action, such as proof of *motive, opportunity, intent, preparation, plan,* knowledge, identity, modus operandi, or absence of mistake or accident.
(Emphases added.)

in part, that "[e]vidence of other crimes, wrongs, or acts *is not admissible to prove the character of a person in order to show action in conformity therewith.*" However, such evidence is admissible only when it is probative of a fact of consequence, i.e., a fact that is of importance to the determination of whether the crime occurred. Thus, if a defendant's motive, opportunity, intent or plan are not pertinent to whether the crime was committed, then proof of those facts is not relevant and the evidence may be excluded. If the evidence is relevant, i.e., probative of a fact of consequence, the second step is to determine, *inter alia,* whether the probative value outweighs the prejudicial effect of the evidence, the admission of the evidence would confuse the jury, or the presentation of such evidence was needlessly cumulative. Courts must balance the need for such evidence against the negative effects of its admission. In this regard, HRE 403 states:

Although relevant, evidence may be excluded if its probative value *is substantially outweighed by the danger of unfair prejudice, confusion of the issues,* or misleading the jury, or by considerations of undue delay, waste of time, *or needless presentation of cumulative evidence.*

(Emphases added.) As the commentary to HRE Rule 403 explains, "unfair prejudice" refers to " 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' " (Quoting Advisory Committee's Note to Fed. R.Evid. Rule 403). This court has explained that

a trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 . . . is reviewed for abuse of discretion. An abuse of discretion occurs when the court clearly exceeds the bounds of reason or disregards rules or principles of law to the substantial detriment of a party litigant.

*Fetelee,* 117 Hawai'i at 62–63, 175 P.3d at 718–19 (internal quotation marks and citations omitted) (ellipsis in original) (emphasis added). Moreover, this court looks to a number of factors in assessing the admissibility of evidence in determining whether its prejudicial effect outweighs its probative value.

[I]n deciding whether the danger of unfair prejudice and the like substantially outweighs the incremental probative value, a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*State v. Castro,* 69 Haw. 633, 644, 756 P.2d 1033, 1041 (1988) (brackets, internal quotation marks, and citation omitted).

IV.

In the instant case, the admission of Petitioner's uncharged prior bad acts was nothing more than evidence used to show that Petitioner was a person of bad character. The testimony was admitted to establish that Petitioner had sexual relations with complainant prior to moving to Hawai'i, but was probative of nothing other than that fact. It permitted the jury to infer that Petitioner was predisposed to commit the offenses with which he was charged by placing before it evidence of prior incidents without establishing that the prior acts were probative of some other fact of consequence. As the commentary to HRE Rule 404 explains, evidence of this type " 'distract[s] the trier of fact from the main question of what actually happened on the particular occasion.' " (Quoting Advisory Committee's Note to Fed.R.Evid. 404.) This "subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened." *Id.* (internal quotation marks and citations omitted). Inasmuch as such evidence presents the risk that the jury convicted Petitioner on an improper basis, it should not have been admitted.

As previously noted, the purposes for which the jury could consider evidence of prior bad acts as set forth in the court's written order differed from those in the jury instruction. The court's order granting Re-

spondent's Motion to Reconsider in part concluded that the evidence of prior bad acts occurring outside of this state was relevant to show "motive, opportunity, and plan[.]" However, the court's instruction to the jury stated it could consider the evidence of the prior bad acts for the purposes of establishing "motive, opportunity, and intent." The majority concludes that the evidence was a fact of consequence only with regard to Petitioner's *opportunity* to engage in sexual relations with complainant and does not address whether the evidence was relevant to proving motive, plan or intent. Majority opinion at 103–04, 237 P.3d at 1169–70. However, the jury could have convicted based on the erroneous view that motive, opportunity, and intent were relevant, and that the prior acts were probative of such matters. Because I conclude that the prior bad acts were not relevant to any of the aforementioned bases for admitting them, I briefly discuss motive, plan, and intent.

### A. Motive

Motive was not a fact of consequence inasmuch as Petitioner's reasons for engaging in prior sexual acts with complainant, out of state, were not relevant to proving that the acts in Hawai'i occurred. " '[E]vidence of motive is admissible to prove the state of mind that prompts a person to act in a particular way; *an incentive for certain volitional activity.* Thus, proof of motive may be relevant in tending to refute or support the presumption of innocence.' " *Fetelee,* 117 Hawai'i at 84, 175 P.3d at 740 (quoting *State v. Renon,* 73 Haw. 23, 37, 828 P.2d 1266, 1273 (1992)) (emphasis added). In the instant case, the "volitional activity" alleged was that Petitioner engaged in a sexual relationship with a minor. Respondent does not identify how Petitioner's motivation in committing the offenses in Hawai'i was a fact of consequence in determining his guilt and makes no discernable argument as to how Petitioner's alleged prior conduct was probative of motive. The issue at trial was whether Petitioner *"knowingly engaged "* in such conduct, *see* HRS §§ 707–730(1)(c) (Supp.2006) and 707–732(1)(c) (Supp.2006), and not Petitioner's underlying motivation or "incentive" to do so. Thus, the evidence was not relevant on that

basis, and the court erred in allowing the jury to consider it for that purpose.

### B. Plan

Plan was not a fact of consequence inasmuch as Petitioner's prior conduct out of state was not indicative of a design or scheme designed to culminate in the charged offenses in Hawai'i. Although the court's written order concluded that the evidence of prior bad acts was "relevant to show [a] plan[,]" the jury was not instructed that it might consider the evidence of Petitioner's prior conduct as part of an overall plan to commit the acts. Regardless of that fact, the evidence of prior bad acts was not probative of an overall plan and should not have been admitted on that basis.

This court has explained that evidence is relevant if it shows "a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others[.]" *State v. Iaukea,* 56 Haw. 343, 350, 537 P.2d 724, 730 (1975) (internal quotation marks and citation omitted). In contrast, the evidence of prior sexual relations between Petitioner and complainant only served to establish that Petitioner acted in conformity with his prior conduct. Nothing in the evidence indicates that Petitioner's actions in South Dakota were part of an overall plan and preparation in order to commit the charged acts in Hawai'i. Nor was establishing any such plan on the part of Petitioner a necessary logical step to establishing that he committed the offenses in Hawai'i. Consequently, the court erred in admitting the evidence on that basis.

### C. Intent

"Intent refers to the state of mind with which an act is done or omitted[.]" *Renon,* 73 Haw. at 36, 828 P.2d at 1272 (citing *Black's Law Dictionary* 810 (6th ed. 1990)). As discussed *supra,* the offenses relating to Petitioner's sexual relationship with complainant required that Petitioner "knowingly" engage in such conduct. Respondent maintains that the evidence of prior bad acts demonstrates that Petitioner had the intent to engage in sexual relations with complainant. (Citing *State v. Torres,* 85 Hawai'i 417,

945 P.2d 849 (App.1997).) In *Torres*, the defendant was accused of subjecting a minor witness to sexual penetration with his finger while bathing her. *Id.* at 422, 945 P.2d at 854. Although he denied the penetration, the defendant did not deny touching the complaining witness's vagina while bathing her, but asserted that it was not done with any " 'bad intentions.' " *Id.* at 420, 945 P.2d at 852. The circuit court admitted evidence that the defendant had initiated physical contact of a sexual nature with the complaining witness on prior occasions to establish that the defendant had "knowingly" penetrated the victim, as was required by the statute. *Id.* The ICA affirmed the admission of such evidence, concluding that "the admitted bad acts were certainly relevant and probative to show" that the defendant had "prompted" the complaining witness to take a bath and had bathed her with the *intent* to engage in the prohibited conduct. *Id.* at 422, 945 P.2d at 854. Put another way, because the defendant denied having the requisite state of mind to commit the act, his intent was directly relevant to the determination of his guilt.

In the instant case, Petitioner did not deny having the requisite state of mind, but rather, he denied having engaged in sexual intercourse or any sort of sexual contact with complainant at all. He made no attempt to base his defense on an absence of the requisite state of mind. Therefore, intent was not a fact of consequence to the determination of whether the crimes in this case occurred and the court erred in allowing the jury to consider the evidence of prior bad acts for that purpose. *See State v. Eastman*, 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996) (citation omitted).

## V. Opportunity

The majority maintains that opportunity was a fact of consequence in determining Petitioner's guilt. According to the majority, 1) the evidence of sexual relationship with complainant was "relevant to establish [Petitioner's] opportunity to engage in the sexual contacts in Hawai'i without being detected[,]" majority opinion at 104, 237 P.3d at 1170, and 2) despite an absence of relevant Hawai'i precedent, case law from other jurisdictions

supports the conclusion that the evidence was relevant to prove opportunity[,] *id.* at 105, 237 P.3d at 1171.

### A.

The majority asserts that the first instance of sexual contact between Petitioner and complainant while they were "sleeping in the same bed with" sister, *id.* at 104, 237 P.3d at 1170, was the culmination of the complainant being "acclimated to the sexual contact[,]" *id.* at 105, 237 P.3d at 1171. According to the majority, without the evidence of an already-established relationship, "it would be implausible that [Petitioner] could suddenly engage in sexual intercourse with [complainant] in a house they shared with her family while [ ] sister slept in the same bed, without [complainant] reporting it." *Id.* at 104, 237 P.3d at 1170. The majority's characterization of the situation is incorrect.

Complainant's testimony regarding her relationship with Petitioner at the time they moved back to Hawai'i renders their subsequent sexual relationship entirely explicable. As recounted before, the Hawai'i evidence indicates Petitioner and complainant slept in the same bed, lived in the same homes, took showers together, and held hands in public. As complainant testified, "[she] told him everything." Petitioner ingratiated himself with her by buying her presents and supporting her in arguments with her family. Complainant testified that "if anytime there was an argument . . . between [complainant] and [ ] sister or something, it seem[ed] like he stuck up for [complainant]." Complainant felt like Petitioner was "there for [her]." Petitioner said having two sisters as wives was part of his culture, he took complainant to work with him, and complainant began to call Petitioner "higna," or husband.

The Hawai'i evidence amply explained how Petitioner was able to establish a submissive sexual relationship with complainant and thus avoided detection. Such evidence also "established [that] a relationship of trust and control," majority opinion at 104, 237 P.3d at 1170, had developed without any reference to prior out-of-state evidence. Under the evidence, Petitioner's "opportunity" to commit the offenses in Hawai'i arose because of his physical and familial proximity to complainant, complainant's difficult family relation-

ships, complainant's dependence on Petitioner, and complainant's fear that Petitioner would be sent to jail if she told others of their relationship. Whether complainant became "acclimated" or not, *id.* at 105, 237 P.3d at 1171, (assuming the relevance of this) the Hawai'i evidence of proximity and dependence was more than sufficient to explain the nature of the relationship.

Petitioner obviously could not have had a sexual relationship without the "opportunity" to do so. All that was required was complainant's close physical presence and her acquiescence stemming from the circumstances recounted above.[8] This made Petitioner's hesitance to report Petitioner plainly understandable. As discussed further *infra,* Respondent's expert witness, Dr. Alex Bivens (Dr. Bivens), also testified that in the majority of cases, those who are sexually abused by family members do not report such abuse. Obviously, complainant's hesitance to alert others was consistent generally with the behavior of abuse victims.

Ultimately, the only distinction between the sexual acts that occurred in Hawai'i and those in South Dakota and Washington is that they were located in different states. Both the acts that occurred in other states and those occurring within this state went undetected. That Petitioner was able to avoid detection in different states was not probative of Petitioner's ability to engage in similar acts while living with other family members in Hawai'i so much as it was a manifestation of the syndrome common to sex abuse victims as described by Dr. Bivens. Prior act evidence was improper in that it only tended to indicate that Petitioner was acting in conformance with those acts. Thus, the evidence of prior bad acts was not probative of any fact of "consequence to the determination of" Petitioner's guilt. HRE Rule 404(b).

### B.

The majority maintains that "cases from other jurisdictions" with similar evidence

rules "have held that such evidence is admissible[.]" Majority opinion at 105, 237 P.3d at 1171. However, cases cited by the majority do not relate directly to opportunity. According to the majority, evidence may be admitted "to show that the defendant had a plan (to gain the child's trust and acquiescence), engaged in preparation (by seducing and testing the child) and did so in order to have the opportunity to engage in sexual conduct with the child without being detected." *Id.* at 105 n. 22, 237 P.3d at 1171 n. 22. Thus, the majority attempts to broadly apply otherwise inapposite cases by asserting that the factors in those cases, such as plan and preparation, "overlap[ ]" with opportunity. *Id.*

As previously explained, plan and preparation are not facts of consequence to Petitioner's guilt for the charged offenses. Moreover, as noted *supra,* the jury was *not* instructed that it may consider the evidence of prior bad acts for the purposes of plan and preparation. The court instructed the jury that "[s]uch evidence may be considered on the issues of [Petitioner's] motive, opportunity, and intent *and for no other purpose.*" (Emphasis added.) Yet, in citing these cases, the majority advances plan and preparation as legitimate bases for considering the evidence in connection with opportunity. *Id.* Finally, the cases apply the factors in ways that conflict with the prohibition in HRE Rule 404 against the use of character evidence.

The majority cites *State v. Cox,* 169 P.3d 806 (Utah Ct.App.2007). *Id.* at 107, 237 P.3d at 1173. In that case, the Utah Court of Appeals's conclusion that "an ongoing behavior pattern which included [the defendant's] abuse of the victim" is admissible "to establish a specific pattern of behavior by the defendant toward one particular child, the victim[,]" *Cox,* 169 P.3d at 814 (internal quotation marks and citation omitted), runs directly counter to HRE Rule 404, which expressly prohibits evidence from being admitted simply to show that a defendant acted in conformity with previous acts. The "behav-

---

8. The majority's reference to a "false impression" that the first sexual contact took place at Kamani Trees, majority opinion at 106, 237 P.3d at 1172, seems unconnected to any material fact. That sexual contact took place at Kamani Trees is what was charged. Hence, whether the exclusion of prior acts would lead to such a "false impression" is not relevant to the charge and assumes what is in question—the necessity of introducing prior bad acts.

ior patterns" that the majority refers to in *Cox* are little more than character evidence establishing that Petitioner was disposed to engage in such conduct. Indeed, in contrast to HRE Rule 404, Utah Rules of Evidence (URE) 404(c) expressly permits the admission of "[e]vidence of similar crimes in child molestation cases" to prove "a person's character or a trait of character[.]" This broad exception to the rule against character evidence directly conflicts with HRE Rule 404. Inexplicably, the majority relies on a case that is clearly inimical to HRE Rule 404. Applying *Cox*, evidence of the out-of-state conduct would allow the jury to improperly decide that Petitioner had sexual relations with complainant in Hawai'i based on his allegedly having committed similar acts on prior occasions.

The majority also cites to the Utah Supreme Court's decision in *State v. Reed*, 8 P.3d 1025 (Utah 2000), majority opinion at 105, 237 P.3d at 1171, which concluded that the defendant's uncharged prior bad acts were admissible because it showed a "pattern" in which the defendant "intensely pursued the victim over a three-and-a-half-year period in order to gain opportunity to commit the unlawful sexual acts[,]" *Reed*, 8 P.3d at 1030. However, *Reed* also conflicts with the HRE in the same way that *Cox* did, inasmuch as it also concludes that a general "pattern of behavior[,]" including prior instances of sexual relations with the victim, was probative of the defendant's "opportunity" to engage in the charged offenses. *Id.* *Reed* reaches this conclusion by relying on URE Rule 404, which again directly conflicts with the HRE Rule 404 prohibition against character evidence.

The majority additionally cites *State v. Baptista*, 894 A.2d 911 (R.I.2006), in which the Rhode Island Supreme Court admitted evidence of prior uncharged sexual relationship with the victim " 'to show the defendant's *intent* and lewd disposition toward the particular child victim[.]' " Majority opinion at 105, 237 P.3d at 1171 (quoting *Baptista*, 894 A.2d at 915–16) (emphasis added). However, as the discussion *supra* explains, Petitioner's intent in this case was not a fact of consequence. Furthermore, "disposition" is synonymous with "character." *See Burton's Legal Thesaurus* 70 (Regular ed. 1981).

To reiterate, HRE Rule 404 prohibits the use of a defendant's "character or a trait of a person's character ... for the purpose of proving action in conformity therewith on a particular occasion[.]" Yet, according to *Baptista*, a defendant's "lewd" character does not fall within the prohibition against character evidence provided that the evidence shows the character trait was being directed "toward the person alleging the acts of sexual assault." 894 A.2d at 915. Inasmuch as evidence in *Baptista* went to the defendant's character and his intent, that case is inapposite.

The majority finally cites *State v. Paul*, 769 N.W.2d 416 (N.D.2009), which affirmed the " 'trial court's admission of evidence that defendant made [the] complaining witness watch 'nasty movies' and engaged in sexual conduct with her in another state prior to the charged conduct as probative of *plan and preparation* [.]' " Majority opinion at 105, 237 P.3d at 1171 (quoting *Paul*, 769 N.W.2d at 425–26) (emphasis added). However, as explained *supra*, plan or preparation was not a fact of consequence in the instant case, inasmuch it cannot be said reasonably that Petitioner's prior uncharged instances with complainant demonstrate a plan to engage in further sexual conduct with complainant in Hawai'i, and the court did not instruct the jury that it could consider the evidence for those purposes. Such evidence is a pretext for admitting prior bad acts to show that Petitioner later acted in conformity with that conduct.

## VI.

Assuming, *arguendo*, the relevance of the evidence of prior bad acts, the risk of prejudice resulting from jury hostility, jury confusion and cumulativeness obviously outweigh its admission. The majority concludes that the probative value of the prior bad acts outweighed any prejudice. However, the majority asserts that absent the evidence of prior bad acts, it "would have been inexplicable" 1) for complainant to not cry out or report the first instance in Hawai'i where Petitioner engaged in sexual acts with her while sleeping in the same bed with sister, and 2) for Petitioner to "suddenly engage in such conduct after having lived in close prox-

imity for three years." Majority opinion at 106–07, 237 P.3d at 1172–73. According to the majority, evidence of prior bad acts was necessary to explain Petitioner's relationship with complainant. However, an examination of such evidence in the context of HRE Rule 403 demonstrates that the majority overstates the need for that evidence and disregards the substantial prejudice in admitting such evidence.

## A.

HRE Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" "This court has explained that '[u]nfair prejudice' 'means an *undue tendency to suggest [a] decision on an improper basis,* commonly, though not necessarily, an emotional one.'" *State v. St. Clair,* 101 Hawai'i 280, 289, 67 P.3d 779, 788 (2003) (quoting *Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 375 n. 22, 944 P.2d 1279, 1318 n. 22 (1997)) (emphasis added). In determining whether unfair prejudice substantially outweighs the probative value of evidence of prior bad acts,

> the trial court must weigh a variety of factors before ruling it admissible. These include "the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the ... time that has elapsed between [them], *the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility."*

*State v. Pinero,* 70 Haw. 509, 518, 778 P.2d 704, 711 (1989) (quoting E.W. Cleary, *McCormick on Evidence* § 190, at 565 (3d ed. 1984) (footnotes omitted)) (emphasis added). In the instant case, unfair prejudice against Petitioner plainly outweighed the probative value of the evidence.

The first factors do not weigh against exclusion of the evidence inasmuch as 1) "strength of the evidence" for both prior bad acts and acts occurring within this state is largely the same due to being provided by the same witnesses; 2) both sets of evidence were similar, pertaining to the same individuals and relations; and 3) the time between

the incidents was not great. However, the factors regarding "the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility[,]" *id.,* compel the conclusion that the court abused its discretion in admitting the evidence.

## B. Efficacy of Alternative Evidence

Evidence regarding uncharged prior bad acts occurring outside of this state was unnecessary inasmuch as the presence of alternative evidence, i.e., evidence of acts within this state, was more than ample to establish Petitioner's guilt for the charged offenses. Efficacy of alternative evidence refers to the "availability of other evidence on the same issues[.]" HRE Rule 403 cmt. In the instant case, the evidence relating to acts that occurred in Hawai'i satisfied this requirement, inasmuch as such evidence was far more probative of the charged offenses. The majority concedes that "the conduct in South Dakota was in substance the same as that in Hawai'i, i.e., alleged sexual contact between [complainant] and [Petitioner]." Majority opinion at 106, 237 P.3d at 1172. However, the Hawai'i evidence also explained how Petitioner was able to engage in sexual relations with complainant while living with others as to the acts actually charged. Assuming, *arguendo,* that it was necessary to show Petitioner's opportunity to obtain complainant's acquiescence and to avoid detection, the evidence relating to acts in Hawai'i was far more effective in explaining Petitioner's ability to commit the charged offenses.

### 1. Kamani Trees House

As noted before, Count 1 covered the period when Petitioner, complainant, and sister lived at the Kamani Trees house with other members of complainant's family. Complainant testified that at the time that she, sister, and Petitioner moved back to Hawai'i and lived in the Kamani Trees house with complainant's parents, she had a close "[f]riendship" with Petitioner. She confided in Petitioner, he bought her presents, "and he was always sticking up for [her], like he was there for [her]." Manifestly, then, their rela-

tionship was one of trust, support, and confidence, positioning Petitioner as someone who was the central figure in her life. Complainant's failure to cry out or report the first time Petitioner sexually assaulted her in Hawai'i while sleeping in the same bed with sister was understandable when viewed in the context of how she felt towards Petitioner at that time. Complainant emphasized her need for Petitioner's affection, his help in coping with her troubled relationship with her parents, as well as his role as a supportive friend. The jury could easily infer from their close physical proximity of sleeping in the same bed and living in the same house, and their close personal relationship that she would submit to his advances and not inform others of their relationship. Moreover, the strained relationships she had with her sister and parents made her unwillingness to report such conduct entirely comprehensible under the circumstances. The other instances of Petitioner's sexual relations with complainant were more surreptitious. Complainant testified that she had sexual relations with Petitioner approximately three to five times per month while living in the Kamani Trees house in either the bedroom or the bathroom while others were not present.

## 2. Aloha Kona House

Count 2 related to the period of time when the complainant lived with sister and Petitioner at the Aloha Kona house. Complainant's testimony relating to the Aloha Kona house shows how Petitioner continued his pursuit of complainant by lavishing her with attention and affection. She testified that Petitioner would come into her curtained off area early in the morning before he left for work to have her braid his hair and talk to her, telling her "[h]ow much he loved [her]." Petitioner continued to create conflict between complainant and her family. According to complainant, Petitioner would tell complainant what "sister was doing, what they argued about, if they did," and that her "parents [were] trying to take [her] away from him[.]" The evidence for Count 2 also established that Petitioner would come into her curtained off area to have sex with complainant at night once or twice a week. Again, this evidence demonstrated how he

obtained complainant's acquiescence to sexual acts and avoided detection.

## 3. Pumehana House

Count 3 covered the period of time when complainant, sister, and Petitioner were living at the Pumehana house, again with complainant living in a curtained off area. Complainant testified that as a result of her closeness with Petitioner, her relationship with sister deteriorated. Petitioner told complainant that sister did not want them to be together. At trial, complainant recounted that she began to call Petitioner "[h]igna[,]" the Lakota Indian name for husband. When complainant tried to distance herself from Petitioner, she found it difficult because "[i]t still felt like [Petitioner] was in control of [her], like he was [her] dad or [her] brother . . . [or] an older person who was taking care of [her.]" Given complainant's view of Petitioner, it would not be surprising that she did not report the abuse. Complainant's references to Petitioner as a companion and husband made her submission to Petitioner manifestly understandable to the jury.

## 4.

Underlying Counts 1–3 is the evidence that sister did little to prevent the abuse or act on her suspicions, creating the opportunity for Petitioner to engage in sexual acts with complainant. With regard to the Hawai'i evidence, sister testified that she confronted Petitioner about his behavior towards complainant. Sister recounted seeing Petitioner holding hands and kissing complainant, and asserted that they were taking showers together. When sister approached Petitioner about his conduct, she said that he became angry with her. However, she maintained that Petitioner stopped showering with complainant after being confronted. She also knew that Petitioner was going into complainant's room in the middle of the night, but made no attempts to prevent this conduct. Petitioner continued treating complainant like a wife, sending her notes saying he loved her, and wearing rings they had given to each other. When sister asked Petitioner if she and Petitioner could move away

but not take complainant with them, Petitioner refused.

Sister's testimony established an emotionally abusive relationship in which she was competing with complainant for Petitioner's affection. Moreover, it plainly explained how Petitioner's advances toward complainant were either ignored by sister or were met with no serious challenge. Sister related numerous instances of Petitioner's conduct that manifested Petitioner was having a sexual relationship with complainant, but sister made no meaningful attempt to curb the behavior, alert others, or separate the two. Plainly, sister's self denial in closing her eyes to Petitioner's behavior is probative of how Petitioner had the opportunity to commit the acts in Hawai'i. Because sister was not actively intervening further explains why complainant did not report the sexual acts. Petitioner was the principle authority figure in their household, and, as was apparent from her own testimony, sister's unwillingness to address the issue was apparent. Obviously, then, the evidence of acts within this state constituted substantial alternative evidence of Petitioner's sexual relations and the circumstances that permitted Petitioner to avoid detection. Consequently, the efficacy of the evidence of acts occurring in Hawai'i would exclude prior bad acts evidence.

### 5.

Additionally, complainant's and sister's testimony regarding the circumstances in Hawai'i provided an abundance of evidence to explain how Petitioner was able to engage in sexual acts with complainant without being reported. It established that complainant had a close relationship with Petitioner and submitted to the sexual relationship. It also revealed that the difficulties complainant had in moving back to Hawai'i and living with her family contributed to fostering such a relationship. The efficacy of this evidence in establishing Petitioner's dominance over complainant and his ability to have unreport-

ed sexual relationships would appear self-evident.

Furthermore, the superiority of the Hawai'i evidence is clear because it related directly to the charged offenses. Evidence of conduct occurring within this state provided sufficient alternative evidence to the prior act evidence to support the convictions and to explain why complainant consented to Petitioner's sexual advances and did not resist or inform others. Such evidence was efficacious in and of itself. In light of the foregoing, the majority's assertion that Petitioner's conduct of "suddenly engag[ing]" in sexual acts after having lived with complainant for three years would have been "inexplicable," majority opinion at 107, 237 P.3d at 1173, is incorrect.

The Hawai'i evidence detailed Petitioner's role as the central figure in complainant's life. The testimony regarding acts occurring outside of this state portrayed Petitioner in much the same way. Plainly, testimony relating to Petitioner's ability to take advantage of his position of influence in complainant's life while in Hawai'i was more than simply alternative evidence of the prior acts occurring outside of Hawai'i. The evidence of prior bad acts had no value other than to show that Petitioner had a propensity to engage in such acts in violation of HRE Rule 404.

### C. Need for the Evidence

### 1.

According to the majority, there was a "strong need" for the evidence to explain complainant's failure to report her first sexual contact with Petitioner while "sister slept nearby" and to explain why Petitioner would suddenly engage in sexual acts with complainant. *Id.* at 106–07, 237 P.3d at 1172–73. In reaching this conclusion, the majority relies in part on the testimony of Dr. Bivens, to the effect that child sexual offenders establish a relationship by a process of "seduction and testing." *Id.* at 104, 237 P.3d at 1170.[9] The majority refers to Dr. Bivens's testimo-

**9.** I note that the majority refers to this testimony primarily in its section on relevance. However, the majority's conclusion that the prior bad acts were relevant to show opportunity also relates to the majority's analysis as to why that evidence was needed to show opportunity. For the sake of avoiding repetition, Dr. Bivens's testimony is addressed with regard to the need for the evidence.

ny that sexual abusers slowly acclimate their victims to increasing sexual contact prior to obtaining their submission. *Id.* at 104–05, 237 P.3d at 1170–71. According to the majority, evidence of prior bad acts was needed to demonstrate this pattern. *Id.* at 106–07, 237 P.3d at 1172–73. The majority asserts that if evidence of Petitioner's first sexual act with complainant in Hawai'i were presented without the context of their prior relationship, it would have been inexplicable and not fit the pattern explained by Dr. Bivens. *Id.*

However, Dr. Bivens testified only to general patterns and was not aware of the specific facts of the case, nor had he "heard any evidence" regarding what had "been alleged" against Petitioner. As a result, he was not in a position to explain Petitioner's actions, the nature of his relationship to complainant, or to discuss why complainant might have consented to Petitioner's first advances in Hawai'i, much less the necessity for prior act evidence. Nevertheless, Dr. Bivens did testify as to the tendency of victims to refrain from informing others about abuse. Dr. Bivens reported that approximately two-thirds of those who were sexually abused do not disclose the abuse until after they are eighteen years old, and that most of those who do disclose abuse, do so to a parent. According to Dr. Bivens, studies concluded that some of the primary reasons for delayed reporting were shame, repression, the belief that telling would not help, and fear of the impact that the disclosure would have on the family.

It is evident from Dr. Bivens's testimony that evidence of prior bad acts was not necessary to explain complainant's situation. Dr. Bivens's testimony provided support for the proposition that complainant's conduct was typical of many victims inasmuch they often do not report incidents of sexual abuse. As the majority's own recitation of facts discloses, complainant's relationship with Petitioner was one in which he was a loved and trusted authority figure whom she relied on for support. *Id.* at 106, 237 P.3d at 1172. Similarly, the discussion *supra* of Petitioner's efforts to exert influence over complainant

account for her acquiescence. Viewed in the context of her relationship with Petitioner, complainant's failure to report the incidents of sexual intercourse in Hawai'i is entirely understandable and consistent with Dr. Bivens's testimony. Dr. Bivens's explanation of the reasons most child victims do not report provides a clear context for complainant's and sister's testimony on that subject. Complainant's age, her level of dependence on Petitioner, and the fear that Petitioner would go to jail, would explain how it was possible for Petitioner to engage in the acts and avoid being reported.

Again, assuming the relevance of the prior bad acts to prove opportunity, there was no need for prior acts evidence to explain "sudden" sexual acts with complainant. Petitioner's opportunity to commit the acts alleged in Hawai'i was shown by his physical proximity to complainant and his relationship with her, proof of which was supplied by considerable evidence regarding the acts in Hawai'i. On the other hand, the prior act evidence would only result in an "undue tendency to suggest [a] decision on an improper basis[.]" *St. Clair*, 101 Hawai'i at 289, 67 P.3d at 788.

2.

The majority relies on this court's decision in *Iaukea* to support its conclusion that the need for the evidence in this case outweighed the prejudice of its admission. Majority opinion at 107, 237 P.3d at 1173. In *Iaukea*, the defendant was convicted of, *inter alia*, "rape in the first degree [and] sodomy in the first degree[.]" 56 Haw. at 345, 537 P.2d at 727. The complaining witness was a social worker who first came into contact with the defendant when the complaining witness worked on the defendant's previous rape case. *Id.* at 346, 537 P.2d at 727–28.

In the course of assisting the defendant, the complaining witness became familiar with the defendant's criminal record, including past assaults and the rape charge, "and obtained a great deal of information about[ ] his

---

The majority's claim that evidence was needed to dispel "the false impression" that the first sexual contact took place at Kamani Trees, majority opinion at 106, 237 P.3d at 1172, is rebut-

ted *supra*. Another "false impression" claim by the majority concerning "the actions" of the complainant, *id.* at 107, 237 P.3d at 1173, would

family background and social problems." *Id.* at 346, 537 P.2d at 728. *Iaukea* concluded that the complaining witness's testimony regarding the defendant's prior bad acts was "essential" to help explain the complaining witness's "calm manner and lack of screaming" as well as "why the complaining witness offered to drive the defendant to his aunt's house, so as not to draw the erroneous conclusion that she was his voluntary social companion." *Id.* at 352, 537 P.2d at 731. In *Iaukea*, the "erroneous conclusion" that the testimony of prior bad acts was intended to dispel was that the complaining witness's actions in giving the defendant a ride and not screaming or struggling was the result of her consenting to have sexual relations. *Id.*

In contrast, the instant case does not present the need to admit evidence of prior conduct. Complainant's submission to Petitioner's sexual conduct was entirely comprehensible in light of their relationship. As already recounted, consent was not at issue inasmuch as Petitioner denied having sexual intercourse or sexual contact with complainant, and complainant's testimony indicated that the incidents occurring in Hawai'i were consensual.[10] Moreover, evidence of consent would have no probative value inasmuch as consent would not have negated any of the elements necessary to convict in Petitioner's case. On the other hand, the offenses in *Iaukea* required proof of "forcible compulsion" to convict, which could be negated by consent. *Id.* at 348 n. 2, 537 P.2d at 729 n. 2. Thus, there was no need for the evidence of Petitioner's prior bad acts that would outweigh the prejudice of its admission.

### C. Rousing Overmastering Hostility

Here, the evidence of the conduct in Hawai'i, as the majority concedes, proved the same overall conduct of sexual relations with complainant. Majority opinion at 107–08, 237 P.3d at 1173–74. This abrogated the

need for such evidence. However, assuming *arguendo* such need, the evidence of prior bad acts was highly prejudicial and likely to "rouse the jury to overmastering hostility." *Pinero,* 70 Haw. at 518, 778 P.2d at 711. Such evidence would interfere with the jury's ability to determine guilt solely on the basis of the acts that occurred in Hawai'i and not those occurring in other states. As the majority states, "The primary difference between the sexual conduct in Hawai'i and that in South Dakota was that the South Dakota conduct occurred *while [complainant] was several years younger,* and, according to [complainant], *occurred more frequently than in Hawai'i.*" Majority opinion at 108, 237 P.3d at 1174 (emphases added). Evidence of sexual intercourse with an eleven-year-old minor would appear more disturbing and inflammatory than evidence of sexual relations with an older person. Nevertheless, the majority attempts to minimize the inflammatory nature of such evidence by arguing that "[Respondent] did not argue in closing that [complainant's] age at the time of the South Dakota contacts made [Petitioner's] conduct more culpable or reprehensible[.]" *Id.*

The majority cites to nothing supportive of its view that the prejudicial effect of admitting such evidence was contingent on Respondent using it in closing argument. As previously explained, a large portion of complainant's and sister's testimony detailed acts of sexual abuse beginning when complainant was eleven years old. The prejudice occurred over the course of the testimony submitted at trial, and it is unreasonable to expect its impact to be limited to what was said in closing argument.

Nor can it be reasonably maintained that the effect upon the jury of the difference in complainant's age from when the acts began and the acts occurred in Hawai'i is negligible. " '[E]vidence of other sexual behavior is, by its very nature, uniquely apt to arouse the jury's hostility.' " *State v. Haslam,* 663

---

appear to generally encompass all its contentions.

10. In this case, consent is not a defense to either the charged offense of sexual assault in the first degree or the lesser included offense of sexual assault in the third degree. HRS § 707–730(1)(c) states in relevant part that "[a] person commits the offense of sexual assault in the first degree if … [t]he person knowingly engages in

sexual penetration with a person who is at least fourteen years old but less than sixteen years old[.]" HRS § 707–732(1)(c) states in part that "[a] person commits the offense of sexual assault in the third degree if … [t]he person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old or causes the minor to have sexual contact with the person[.]"

A.2d 902, 912 (R.I.1995) (quoting *State v. Jalette,* 119 R.I. 614, 382 A.2d 526, 533 (1978)). Undoubtably, such evidence substantially increased the jury's hostility towards Petitioner and was likely to "rouse the jury to overmastering hostility[.]" *Pinero,* 70 Haw. at 518, 778 P.2d at 711. Furthermore, the allegations that Petitioner engaged in sexual relations with complainant more frequently on the mainland were exceedingly prejudicial. Both the age of complainant and the frequency of the sexual assaults pertaining to the out-of-state acts would have " 'an undue tendency to suggest decision on an improper basis[,]' " HRE Rule 403 cmt. (quoting Fed.R.Evid. Rule 403 advisory committee's note), inasmuch as such evidence suggests that Petitioner's prior sexual abuse of complainant was much more frequent when complainant was much younger.

Unlike the prior act evidence, the Hawai'i evidence avoided the risk that the jury would decide Petitioner's guilt on an improper basis, i.e., its visceral reaction to Petitioner's prior uncharged sexual acts with an eleven-year-old girl. Such evidence went only to prove Petitioner's character by showing that his actions in Hawai'i were in conformity with his acts in South Dakota and Washington, thereby violating the HRE prohibition against such evidence. In light of the minimal probative value of prior bad acts, and the substantial likelihood that Petitioner was unfairly prejudiced by evidence of the uncharged prior bad acts, the court abused its discretion in admitting that evidence.

### D. Confusion of the Issues

HRE Rule 403 provides in part that "relevant[ ] evidence may be excluded if its probative value is substantially outweighed by the danger of ... confusion of the issues[.]" During its deliberations, the jury submitted jury question 1, which asked, "To what purpose do we put the evidence and testimony from S. Dakota[?]" The court responded simply by referring the jury back to the instruction limiting the consideration of prior bad acts. The jury was given no further explanation with regard to that question. Transcripts of the proceedings do not indicate that the court gave the jury a cautionary

instruction with regard to the purposes for which complainant's testimony of prior bad acts could be considered at the time she testified. The jury's confusion as to the introduction of prior bad acts is apparent from the jury's question even after it had been instructed on the use of such evidence.

Nevertheless, the majority maintains that Petitioner's "intensified efforts to maintain his relationship of trust and control with [complainant] after they returned from Hawai'i ... would be likely to confuse rather than enlighten the jury absent the context provided by the prior conduct in South Dakota." Majority opinion at 107, 237 P.3d at 1173. To the contrary, the jury's question to the judge indicates that the prior act evidence was the *cause* of confusion. Details regarding the uncharged conduct were not relevant to the charged offenses and obviously only served to distract the jury from the principle issue of Petitioner's guilt for the offenses that were charged.

Rather than confusing the jury as declared by the majority, Petitioner's "intensified efforts" to assert control over complainant established how Petitioner was able to assert himself as the central authority figure amidst complainant's dysfunctional family relationships. Petitioner's behavior, as testified to by complainant and sister, explained the matters that the majority maintains were inexplicable absent the evidence of prior bad acts. Given the minimal benefit derived from the evidence of prior bad acts and the disproportionate confusion it generated, as demonstrated by the jury's question to the court, the cost-benefit analysis plainly weighed in favor of excluding the evidence. "Evidentiary decisions based on HRE Rule 403, which require a 'judgment call' on the part of the trial court, are reviewed for an abuse of discretion." *Walsh v. Chan,* 80 Hawai'i 212, 215, 908 P.2d 1198, 1201 (1995) (citing *Sato v. Tawata,* 79 Hawai'i 14, 19, 897 P.2d 941, 946 (1995)). Hence, the court abused its discretion in admitting such evidence.

### E. Cumulative Evidence

In addition to being highly prejudicial, evidence of prior bad acts was manifestly cumulative. Under HRE Rule 403, evidence that

is needlessly cumulative of other evidence is excluded. "In order for evidence to be considered 'cumulative' for HRE [Rule] 403 purposes, it must be substantially the same as other evidence that has already been received." *State v. Pulse,* 83 Hawai'i 229, 247, 925 P.2d 797, 815 (1996) (citing *Aga v. Hundahl,* 78 Hawai'i 230, 241, 891 P.2d 1022, 1032 (1995)). The majority's own discussion of the acts alleged makes it obvious that the prior bad acts and the charged offenses were "substantially the same[.]" *Id.* According to the majority, "[t]he conduct in South Dakota was of the *same general type and involved the same complaining witness* [,]" majority opinion at 107, 237 P.3d at 1173 (emphasis added), and "[t]he similarities between the crimes were strong, since the conduct in South Dakota *was in substance the same as that in Hawai'i, i.e., alleged sexual contact between [complainant] and [Petitioner,]*" *id.* at 106, 237 P.3d at 1172 (emphasis added). As noted *supra,* the evidence of uncharged prior bad acts and charged offenses both involved references to sexual relations between Petitioner and complainant in close proximity to a family member. Moreover, both the evidence of the uncharged prior bad acts and the charged offenses describe a situation in which Petitioner was the dominant figure exerting control in the lives of both complainant and sister. Inasmuch as evidence of acts in and out of state were "substantially the same[,]" *Pulse,* 83 Hawai'i at 247, 925 P.2d at 815 (citation omitted), presenting identical bases for explaining complainant's behavior was needlessly cumulative, and the court's failure to exclude the prior acts was an abuse of discretion.

## VII.

Finally, Petitioner argues that the ICA gravely erred in affirming the court's conclusion that there was a rational basis to instruct the jury on the lesser included offense of sexual assault in the third degree. I agree that the ICA did not gravely err in ruling that there was a rational basis to instruct the jury on the lesser included offenses. In my view, however, the majority's assertion that the sexual contact underlying the sexual assault convictions may be inferred from evidence of sexual penetration is wrong.

The jury acquitted Petitioner of the greater offense of sexual assault in the first degree, which required proof that Petitioner "knowingly engage[d] in *sexual penetration* with" complainant, HRS § 707–730(1)(c) (emphasis added), and convicted on the basis that Petitioner "knowingly engage[d] in *sexual contact* with" complainant,[11] HRS § 707–732(1)(c) (emphasis added). The majority concludes that Petitioner was guilty of engaging in sexual *contact* that occurred *prior* to the penetration *for which Petitioner was found not guilty.*

The jury's verdict of guilty of the lesser included offenses constitutes an implied acquittal for the greater offense. *See, e.g., Green v. United States,* 355 U.S. 184, 190, 78

11. As noted by the ICA, an amendment to the definition of sexual contact took effect during the time period covering Count 3. *Behrendt,* 2009 WL 3653563, at *3. The definition of sexual contact prior to 2004 included *"any touching* of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts." HRS § 707–700 (1993) (emphasis added). The amended definition of sexual contact states:

> "Sexual contact" means any touching, *other than acts of "sexual penetration",* of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

HRS § 707–700 (Supp.2004) (emphasis added). The amended definition of sexual contact applies to Count 3, whereas the prior definition applies to Counts 1 and 2. As the ICA explained, the legislative history behind the amendment to the definition of sexual contact reveals an intent to overturn the result in *State v. Mueller,* 102 Hawai'i 391, 76 P.3d 943 (2003), and "to clarify the legislature's intent that the definition of 'sexual penetration' includes the acts of cunnilingus and anilingus whether or not actual penetration has occurred." 2004 Haw. Sess. Laws Act 61, § 2 at 302. Mueller prohibited the prosecution of sexual assault involving cunnilingus and anilingus as first-degree sexual assault absent proof of penetration. 102 Hawai'i at 394–97, 76 P.3d at 946–49.
*Behrendt,* 2009 WL 3653563, at *3.

S.Ct. 221, 2 L.Ed.2d 199 (1957). The only reasonable inference to be drawn from Petitioner's acquittals on the greater offenses of sexual assault in the first degree is that the jury determined that he did not *penetrate* complainant vaginally, anally, or orally.[12] Yet, the majority asserts that "a rational juror could have inferred that there was 'sexual contact' prior to the penetration[.]" Majority opinion at 110, 237 P.3d at 1176. This is impossible inasmuch as the jury's conclusion that Petitioner did not penetrate complainant would preclude it from inferring that sexual contact occurred in the course of penetration.

Nevertheless, complainant did testify that, any time she and Petitioner had sexual intercourse, complainant would also "lick" or "suck" on Petitioner's penis to "get it wet with [her] saliva." Initially, the conduct appears to be fellatio inasmuch as that is defined as "the practice of obtaining sexual satisfaction by oral stimulation of the penis[,]" *Webster's Third New Int'l Dictionary* 836 (1966), and therefore falling under the definition of sexual penetration. However, inasmuch as licking would not constitute penetration, but rather is the "touching" of "sexual or other intimate parts[,]" it falls under the definition of sexual contact. HRS § 707–700. These conclusions would be consistent in that the jury may have disbelieved complainant's testimony with regard to intercourse but believed her statements regarding

licking Petitioner's penis. Consequently, there was substantial evidence to support Petitioner's convictions for the lesser included offenses under Counts 1–3.

## VIII.

In conclusion, the court erroneously admitted the evidence of uncharged prior bad acts inasmuch as the evidence only served to demonstrate that Petitioner was a person of bad character who "acted in conformity therewith." HRE Rule 404 cmt. Such acts were not relevant to Petitioner's motive, plan, intent, or opportunity; assuming, *arguendo*, their relevance, the prejudice resulting from the evidence outweighed its probative value; the evidence likely resulted in juror confusion; and the evidence was unnecessarily cumulative. Furthermore, the convictions as to the lesser included offense of sexual assault in the third degree should not be inferred from sexual penetration. Therefore, I would vacate Petitioner's convictions and remand for a new trial on Counts 1–4.[13]

12. Complainant's testimony described numerous occasions falling within HRS § 707–700 (1993), which defined sexual penetration as *"vaginal intercourse, anal intercourse, fellatio,* cunnilingus, anilingus, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs on any penetration, however slight, but emission is not required." (Emphasis added.) An amendment to HRS § 707–700 in 2004, during the time period covered by Count 3 altered the definition of sexual penetration to include "[c]unnilingus or anilin-

gus, *whether or not actual penetration has occurred."* HRS § 707–700 (Supp.2004) (emphasis added).

13. I agree with Petitioner that there is a substantial likelihood that the unfair prejudice of admitting the evidence of uncharged prior bad acts also tainted the jury deliberations as to Count 4. It would be unreasonable that the prejudice engendered by the evidence of prior bad acts did not extend to the jury's deliberations on the charge of kidnapping. Thus, I would remand for a new trial on Count 4 also.